135 So.2d 26 (1961)
CROWN CENTRAL PETROLEUM CORPORATION, a corporation, Appellant,
v.
STANDARD OIL COMPANY, a corporation, and R.A. Gray, as Secretary of State of the State of Florida, Appellees.
No. C-367.
District Court of Appeal of Florida. First District.
November 21, 1961.
Rehearing Denied December 14, 1961.
*27 Ausley, Ausley, McMullen, O'Bryan, Michaels & McGehee, Tallahassee, for appellant.
Botts, Mahoney, Whitehead, Ramsaur & Hadlow, Jacksonville, Richard W. Ervin, Atty. Gen. and Wilson W. Wright, Asst. Atty. Gen., for appellees.
RAWLS, Judge.
This appeal involves a trademark case wherein the rights of the parties to the use of the word "Crown" in the State of Florida are in issue. The Chancellor outlined the rights of each party in the summary final decree from which appellant has appealed. Defendant appellant will be referred to as Crown Central and plaintiff appellee will be referred to as Standard Oil. The basic facts are not in dispute.
Prior to the year 1919, and continuously to the present time, Standard Oil has sold large quantities of gasoline and lubricating oil and other petroleum products in the State of Florida. The gasoline has predominantly been sold under a label or trade-name of "Crown", sometimes alone, or sometimes in connection with other words such as "Crown Extra." Other petroleum products, including lubricating oils, sold by Standard Oil have not been labeled "Crown". During this period of time, Standard Oil has conducted extensive advertising efforts by publishing maps, signs at its retail service stations, and newspaper advertising in promoting the sale of its petroleum products, including the emphasizing of its "Crown" brand of gasoline. As early as 1921, newspaper advertising has been exhibited featuring the word "Crown." Standard Oil made no effort to register its trademark "Crown" with the Secretary of State until 1957, at which time it discovered that Crown Central had registered its trademark of "Crown," and derivatives thereof, with the Secretary of State in 1947, and had tendered to the Secretary of State in September 1958, its applications to renew each registration. Shortly thereafter Standard brought complaint in the instant cause.
Crown Central registered the word "Crown" as a trademark in the United States Patent Office on May 9, 1903, and again in accordance with the Lanham Act on July 5, 1946, and it now contends that it was the first user of said word and the derivatives therefrom, including "Crown Oil*Gas," "Crownzol," "Crown Winged Power," and "Crown Oil Burner." Crown Central takes the position that it is the exclusive owner of these trademarks, and that it is entitled to renew its registrations of same and to use the same in the State of Florida.
Crown Central has from time to time, made wholesale sales of lubricating oil in the State of Florida in bulk containers such as drums, barges, and by pipe line to various independent distributors or jobbers, who thereafter did not use the mark "Crown," or any related mark when selling the product in Florida. In 1947, an isolated wholesale sale in Florida of lubricating oil in containers bearing the trademark "Crown" was shown by Crown Central. Save for this isolated sale, the record does not reflect competent evidence of any other sales by Crown Central of petroleum products, to the general public in Florida utilizing the trade name "Crown" or derivatives therefrom. Crown Central has never maintained any bulk terminals, offices, service stations, or other place of business in Florida, nor has it ever conducted any method of advertising directed toward the general public in the State of Florida *28 concerning its petroleum products. Its business in Florida is in the words of the Chairman of the Board of Crown Central: "Whatever business we do in Florida is handled as a part of the wholesale operation which is headquartered in Atlanta."
In substance, the facts show that Standard Oil has developed and marketed its retail gasoline sales in the State of Florida for more than forty years primarily under the trademark of "Crown" and that such marketing has been of an intensive nature in every county of the state. During this same period of time, Crown Central, save for an isolated sale, marketed in bulk in Florida its petroleum products at wholesale including lubricating oil and gasoline in such a manner that same had no identity to the general public of Florida as a "Crown" product.
Standard Oil takes the position that its long usage of the word "Crown" in the sale and distribution in Florida of gasoline at retail prohibits Crown Central from moving into the Florida market and utilizing any of its "Crown" trademarks in the sale of gasoline or lubricating oil at retail.
Common law rights in trademarks are now and have always been recognized in Florida. Section 495.02(6), Florida Statutes 1959, F.S.A.,[1] specifically provides that a trademark shall not be registered which so resembles a trademark used in this state by another and not abandoned, as to be likely when applied to the goods of the applicant, to cause confusion or mistake or to deceive. Standard's common law ownership of the word "Crown" as to gasoline sales at retail in the State of Florida is undisputed. Standard has not used the word "Crown" as it relates to sale of lubricating oil at either wholesale or retail. Therefore, the main issue before the Chancellor was whether the use of its trademarks in the sale of lubricating oil at retail in the State of Florida, when applied to the goods sold by Standard, would likely cause confusion. Crown Central urges that since Standard has not used and has displayed no intention to use the word "Crown" in the sale of lubricating oils at retail in Florida, that Section 495.01[2] precludes Standard from claiming any right to same as it relates to lubricating oils since lubricating oils are separate "goods." The Chancellor found that Standard has acquired and now owns the title to the word "Crown" as a slogan or tradename for the sale of gasoline in the State of Florida, and that the sale of lubricating oils at retail is so closely associated with the sale of gasoline that the use of the word "Crown" by a competitor selling both gasoline and lubricating oil would necessarily cause confusion and likely lead to mistake by the public in the purchase of these products; that the registration or use by Crown Central in the State of Florida of the words "Crown Oil and Gas," "Crownzol," or "Crown Winged Power" in the merchandising of gasoline or lubricating oil except bulk sales at wholesale, would be in violation of Standard's rights. Included in the Chancellor's decree was a finding that Crown Central owned the trademark "Crown Oil Burner" and that Standard had no right to same. The record reflects ample evidence to sustain the Chancellor's findings.
"Crown Winged Power" has been promoted by Crown Central in adjoining areas as a trademark for gasoline. The wording of the trademark "Crown Oil*Gas" within itself ties the two petroleum products together *29 as single "goods." Crown Central in its answer, affirmatively alleged that it uses the word "Crown" and derivatives thereof to identify all types of petroleum products manufactured and marketed by it, including gasoline and lubricating oils, and that it also used the word "Crown" to identify its service stations at which gasoline manufactured by it and various other petroleum products are sold. The Chancellor was confronted with Standard, retailer of gasoline, that had over a period of forty years, extensively advertised and promoted the word "Crown" in its sale of gasoline at retail throughout Florida; and Crown Central, which insofar as Florida was concerned had never exploited the general retail market, however, displaying an intention to so do some time in the future, with petroleum products labeled "Crown" and derivatives thereof, intertwined with service stations, gasoline, and lubricating oils.
The law controlling trademark cases in Florida was clearly enunciated in the El Modelo Cigar Mfg. Co. v. Gato, 25 Fla. 886, 7 So. 23, 6 L.R.A. 823, when the Court stated in its syllabus on page 24:
"Every manufacturer has the unquestionable right to distinguish the goods that he manufactures and sells by a peculiar label, symbol, or trademark, and no other person has a right to adopt his label or trademark, or one so like his as to lead the public to suppose the article to which it is affixed is the manufacturer's."
In Quality Courts United v. Jones (Fla. 1952), 59 So.2d 20, 23, Mr. Justice Terrell again enunciated the rule of Florida when he stated:
"In this holding we do not mean to infer the plaintiff has acquired a copyright on the word `quality' vesting it with the exclusive use of that term. What we hold is that appellant has employed the word `quality' in relation to his business so as to give its tourist accommodations a distinct and popular favor with the public which it has a right to preserve. When one has employed an emblem or a legend so as to make it a symbol for a public desire and by acts of courtesy fortifies it with good will, it becomes an elemental part of his business that the law will protect. Many of the great businesses of the country have been built on slogans and symbols that point to superior goods or to superior performance. The volume of good will accumulated with such businesses is one of their most valuable assets. The word `quality' as applied to appellant's courts was such an asset."
A situation similar to this one is Food Fair Stores, Inc. v. Square Deal Market Co., 206 F.2d 482 (D.C. Cir., 1953). In that case, Food Fair Stores opened its first "Food Fair" supermarket in Baltimore in 1935, and subsequently enlarged the chain to 151 stores, almost all of which bore the name "Food Fair." Square Deal Market Co. had a small chain of stores opening its first store named "Food Fair" in the District of Columbia in 1936, subsequently enlarging its chain in the District area. In 1948, Food Fair Stores sought to enjoin the use by Square Deal Market Co. of the name "Food Fair" and after trial, the District Court granted Square Deal Market Co.'s counterclaim for an injunction within the Washington, D.C. area. The end result was that Food Fair Stores was not only enjoined from using the words "Food Fair" as a name for its store, but was enjoined from using the words "Food Fair" in marketing any of its merchandise. On pages 485-486 the Court stated:
"Appellant's final contention is to the effect that, since `Food Fair' is its registered trade mark for use on packaged butter and eggs, it should not in any event have been enjoined from that use of the words in the Washington area. But the fact of registration is immaterial in the present context. United Drug Co. v. Theodore Rectanus *30 Co., 1918, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141; Griesedieck Western [Brewery] Brewing Co. v. Peoples Brewing Co., 8 Cir., 1945, 149 F.2d 1019. And the fact that, so far as the record shows, appellee has never used the contested words as a trade mark on merchandise is not controlling. All parties agree in this case that the sale of packaged items bearing the label `Food Fair' in appellant's Food Lane stores in the Washington area tends to create public confusion as to whose the merchandise is or what connection, if any, appellee has with it. There is no doubt that the injunction will create a serious operating problem for appellant. But appellant itself provoked this result when it sought to enter an area in which, as it plainly knew, the words `Food Fair' had already become associated with another enterprise." (Emphasis supplied.)
Great reliance is placed by Crown Central upon a recent Florida case decided by the United States Court of Appeals, Fifth Circuit, Webb's City, Inc. v. Bell Bakeries, 226 F.2d 700 (1955). The factual situation involved the sale of "Dandee" bread by defendant, Bell Bakeries, Inc., in retail stores in the St. Petersburg area, as opposed to the promotion and sale by plaintiff, Webb's City, of "Dandy" bread for a period of some fourteen prior years. The trial Court found that Webb's City introduced evidence that no confusion would occur in that "Dandy" bread was only available in Webb's City store while "Dandee" bread was available in the general market. The Appellate Court obviously gave great weight to the trial Court's findings when it stated on page 702:
"Here the fact and the likelihood of customer confusion were not only not proved by the plaintiff; they were disproved by the defendant. What the plaintiff would have us do here, therefore, is make a finding as a matter of law, contrary to what has already been found below, as a matter of fact."
To the above enunciation we can agree. However, the Court went further in this opinion by stating on the same page:
"Under the law of Florida, as under the common law of most states, customer confusion is the gist of the actionable wrong. The common law does not give anyone the exclusive use of a trade name, even where that name is distinctively associated by the public with his product. The prior user has a remedy in the Courts only where a competitor so disguises his product, by means of its name or package, or so promotes it, by any type or combination of advertising schemes, as to lead the casual buyer to purchase the imitation because he believes it to be the original."
Crown Central construed the above statement to mean that either actual confusion must be proven or a fraudulent design must be shown on the part of a competitor. We do not find such a proposition to be the controlling law in Florida. To accept such a doctrine, would in our opinion abrogate that part of Section 495.02(6), supra, which states: "* * * as to be likely, when applied to the goods of the applicant, to cause confusion or mistake or * * * deceive," and would be in conflict with the decisions of the Supreme Court of Florida on the subject. We do not find any proof of actual confusion in the Quality Courts United v. Jones, supra. Standard employed the word "Crown" in relation to its business and it is an elemental part of its business that the law will protect.
Finally, it is urged that where all the evidence considered by the Chancellor was of a documentary nature, as in this case, that the question of likelihood of confusion was a matter of law and for judgment by the Court, and, therefore, this Court is at liberty to reach its own conclusions from the record as a whole without being restricted by the Chancellor's findings. Such an approach, we think, *31 would cause confusion to the bench and the bar. A like proposition was urged before the United States Court of Appeals in Esso Standard Oil Company v. Sun Oil Co., 97 U.S.App.D.C. 154, 229 F.2d 37, 42 (D.C. Cir., 1956), where the Court in disposing of this question stated:
"It may perhaps be suggested that the District Judge, after consideration of all the evidence, was entitled to rule that in his own independent judgment there was no likelihood of confusion, and that his determination should prevail unless upon appeal the reviewing Court takes a different view and substitutes its own independent judgment about the matter. Such a rule would, we think, be quite unworkable, would create confusion, discrimination and uncertainty, and would be outside the permissible scope of judicial review of administrative action  even where, as here, Congress has authorized an action de novo to review the administrative ruling."
The true test in this type of case is succinctly stated in Callmann's Unfair Competition and Trade Marks, Vol. 3, 2nd Edition, on page 1361:
"Where the public is deceived `into believing that good will, or investment, of another, are enjoyed by or is a part of another's business, so that the ordinary public would be led to believe that, in dealing with such person, it was also dealing in some way with the other' we have an evident confusion of businesses. This, it will be seen, is a confusion with respect to source and origin alone, for, while the products of the litigants may actually differ in make, purpose and function, it is conceivable that the confusion will be such that the defendant's goods might be supposed to have come from the plaintiff, or that the business of the plaintiff might be supposed to have a connection with the business of the defendant, which sometimes is called `confusion as to sponsorship.'"
The Chancellor found that Crown Central had not tapped the retail market for gas and oil in Florida, and that it had other established brands that it could merchandise in Florida without working any hardship upon Crown Central. Since the record clearly shows Crown Central's present intention to expand its Crown Service Stations and to market at retail petroleum products under its "Crown" trademarks, a disservice would have been rendered to both parties had the Chancellor held that Standard Oil could take no action until Crown Central had actually entered the Florida market and had promoted its goods and services under a "Crown" trademark to the extent that actual confusion could be proven. This seemingly is what Crown Central urges must be done prior to adjudication of the rights of these parties. To accept such a proposition would in effect encourage the development of a factual situation analogous to Food Fair Stores v. Square Deal Market Co., supra. This, in our opinion, is not the settled law of Florida.
We find that the Chancellor had ample competent evidence with which to reach his findings. The rule is too well settled to require the citation of authorities that the decree of the Chancellor on the evidence will not be reversed if there is, as in the present case, sufficient evidence to sustain the decree.
The decree appealed from is affirmed.
CARROLL, DONALD K., Chief judge, concurs.
WIGGINTON, J., dissents.
WIGGINTON, Judge, (dissenting).
I regret that I am unable to agree with my colleagues that the decree appealed is free from error and should be affirmed.
The facts in the case are not in substantial dispute. Crown Central and its corporate predecessors have for a long *32 period of years been engaged in the business of producing, refining and selling, both at wholesale and retail, petroleum products processed from crude oil. On May 9, 1903, the company registered the trademark "Crown" in the United States patent office, which trademark was subsequently re-registered on July 5, 1946, in accordance with the provisions of the Lanham Trademark Act.[1] The re-registration was without condition or limitation and carried with it the right to use the trademark throughout the United States. From the date of its origin to the present time Crown Central has utilized this trademark, and certain derivations thereof, for the purpose of identifying petroleum products produced and sold by it, which products include gasoline, lubricating oils, greases, diesel oil, kerosene and heating oils. In the early stage of its operation Crown Central's retail business was confined largely to states located on the northern Atlantic Seaboard, but through the course of years its trade territory has gradually extended southward into the southern states of the country.
In the year 1947 Crown Central delivered for retail sale in Florida one shipment of its lubricating oil packaged in one quart cans and bearing the trademark "Crown". Immediately thereafter it registered with the Secretary of State the trademarks "Crown Oil and Gas", "Crownzol", "Crown Winged Power" and "Crown Oil Burner". Since the date of registering the foregoing trademarks, Crown Central's Florida business marketed under such trademarks has been exclusively confined to bulk sale of its gasoline and lubricating oil at wholesale, and it has not attempted to merchandise for retail sale any of its petroleum products bearing those trademarks. Delivery of its products pursuant to bulk sales in Florida has been by barge, tank railroad cars and oil drums.
Appellee, Standard, is one of the major oil companies of this nation which for many years has been engaged in the business of producing, refining and selling petroleum products throughout the country. In 1929 Standard attempted to register the trademark "Crown" in the United States patent office, which application was rejected on the ground that Crown Central had previously registered this mark. Standard then presented for registration a composite trademark consisting of a circular emblem designed in contrasting colors with the word "Crown" inscribed in the form of an arc at the top of the design, the word "Gasoline" inscribed in the form of an arc at the bottom of the design, the word "Standard" inscribed in a straight line across the center under which is the abbreviation "KY". It was only because of the composite nature of the trademark submitted by Standard, which included the word "Crown" in connection with other words making up the complete design, that Standard's application was approved by the United States patent office, and the trademark registered.
For more than forty years Standard has engaged in the retail sale of gasoline and other petroleum products in the State of Florida. Its products are sold through gasoline service stations owned or controlled by Standard and identified as such by uniform colors as well as by signs prominently displayed on the premises bearing the legend "Standard", "Standard Oil Products", or "Standard Oil Company". In the advertisement and sale of its gasoline Standard has for many years used the single mark "Crown" disassociated from its trademark as registered in the United States patent office. This mark has been prominently displayed on a globe mounted upon the top of the gasoline pumps located in its service stations throughout Florida. The evidence reveals, however, and the Court so found, that Standard has never used the mark "Crown" in connection with the advertisement or sale of its lubricating oils or other petroleum products. The lubricating oils distributed and sold at retail by Standard through its service stations are merchandised under the trade names of "Mobiloil", *33 "Esso", "Esso Extra", "Esso Uniflow", and "Standard Oil".
In September, 1958, pursuant to the provisions of the Trademark Act adopted by the Florida Legislature in 1957,[2] Crown Central filed application with the Secretary of State to re-register the trademarks previously registered by it to-wit: "Crown Oil and Gas", "Crownzol", and "Crown Winged Power". It also applied for registration of the trademark "Crown". It is noted that Standard's application made during the previous year of 1957 to register the trademark "Crown" in the office of the Secretary of State was rejected for the reason that this trademark had been theretofore registered by Crown Central. Standard learned of Crown Central's application in 1958 to re-register its trademark "Crown", both singly and in conjunction with other descriptive words denoting Crown Central's petroleum products. Upon receipt of this information Standard instituted this action which culminated in the entry of the decree from which this appeal is taken.
Upon the facts summarized above the chancellor held that Crown Central has not acquired a title to use of the trademark "Crown" as a means of advertising or marketing its petroleum products for retail sale in Florida. To the contrary, he found that Standard has acquired and now owns title to use of the word "Crown" as a slogan or trade name for the retail sale of gasoline in this state. The chancellor further held that the sale of lubricating oils at retail is so closely associated with the sale of gasoline that the use of the word "Crown" by a competitor selling both gasoline and lubricating oil would necessarily cause confusion and likely lead to mistake by the public in the purchase of these products. The Chancellor made the additional finding that Crown Central's trademark "Crown Oil Burner" is confined to the merchandising of heaters, and due to the absence of any relationship between this product and the petroleum products sold by Standard, the use of the word "Crown" in connection with heaters would not cause confusion nor infringe upon any rights of Standard to the use of this trademark in the sale of its products. It was accordingly decreed that: (1) Standard has in the State of Florida exclusive title to and the right to use "Crown", or any phrase including this word, in the advertisement and merchandising of gasoline and lubricating oils at retail; (2) The registration in the name of or use by Crown Central of the trademarks "Crown Oil and Gas", "Crownzol", or "Crown Winged Power" in the merchandising for retail sale of gasoline or lubricating oil would be in violation of Standard's rights; and, (3) Standard has no title to the use of the word "Crown" in the merchandising of oil burning heaters, nor the right to register as against the right of Crown Central to this registration and use of the trademark "Crown Oil Burner".
It is noted at the outset that this case does not involve any charge of fraud by Crown Central in the registration and attempted use by it of the trademark "Crown". Therefore, that body of the law dealing with the fraudulent infringement of trademarks is not applicable to the issues here presented, and should not be considered in reaching our decision.
In the field of trademark litigation several fundamental principles of law are well recognized and uniformly followed. The difficulty invariably lies in the application of those principles to the peculiar facts in each case. It is Standard's contention, and the evident theory on which the decree is predicated, that the trademark "Crown", as it relates to petroleum products, has acquired a secondary meaning in Florida denoting quality products manufactured and sold by Standard and having a high degree of public acceptance. Standard's right to the exclusive use of this trademark in the retail sale of petroleum products may *34 be protected only if it is shown that Crown Central's use of the same trademark in the advertisement and merchandising of its petroleum products constitutes unfair competition. This is so for the reason that "the law governing trade-marks is but a branch of the law regulating trade competition. The policy of this law is to foster, not to hamper, competition and it permits a monopoly in the use of the trade-mark only when it has become the absolute and exclusive property of the first user  good against the world. A merely descriptive name can never become such property, * * * and the utmost the first user of such a name after it has acquired a secondary meaning can insist upon is that no one shall use it against him in an unfair way. Accordingly, the second user becomes an infringer only when he makes an unfair use of the mark. Not any competition, but only unfair competition on the part of such user is actionable."[3]
As stated by the United States Circuit Court of Appeals in Webb's City, Inc., "Under the law of Florida, as under the common law of most states, customer confusion is the gist of the actionable wrong. The common law does not give anyone the exclusive use of a trade name, even where that name is distinctly associated by the public with his product. The prior user has a remedy in the Courts only where a competitor so disguises his product, by means of its name or package, or so promotes it, by any type or combination of advertising schemes, as to lead the casual buyer to purchase the imitation because he believes it to be the original."[4] In Williamson this Court held: "It is undoubtedly true that generic terms or mere descriptive words are not ordinarily susceptible of exclusive appropriation by an individual as a trademark or trade name. Such terms are deemed to be the common property of the public, and thus available to be used by anyone engaged in offering goods or performing services which the terms describe. * * * However, it is recognized that even generic words and terms may, by usage, acquire a secondary, special or trade meaning as indicating or identifying the goods, business or services of the user, as distinguished from its common or general meaning. In such cases the user is entitled to protection against subsequent unfair or piratical use of such words or terms by another."[5]
Based upon the foregoing principles the following practices have been held to result in the likelihood of confusion in the minds of the public and to constitute unfair competition entitling the first user of a trademark to protection against the use of the same or similar trademark by a subsequent user.
Where identical goods serving the same purpose and closely associated in the public mind are sold in competition with each other through the same retail outlets, the first user of the trademark will be protected against the use of the same or similar trademark by a subsequent user.[6]
Even though products are of a different origin and serve a different purpose or use, if they are sold to the public through the same retail outlets to the same class of purchasers for a similar low price, the first owner of the trademark will be protected against the use of the same trademark by the one last adopting it.[7]
Where similar products have a similar purpose or use, are derived from the same common source, produced by the same process, fall within the same general classification *35 of United States patent office regulations on trademarks, and are sold to the same class of consumers, the manufacturer first using a trademark to identify his product will be protected against the use of the same trademark by a subsequent manufacturer.[8]
Even though trademarks are not identical, if they are used to denote identical products similar in size, shape and color which are sold competitively through the same retail outlets in packages or containers which are similar in general appearance with respect to stamps, brands, pictures, labels and letters, such practice is calculated to cause confusion and mislead an ordinary purchaser, consequently the first user of the trademark will be protected against the subsequent user.[9]
Where similar or identical names, symbols or designs are used to advertise identical competitive products, even though such products are sold exclusively from different retail outlets, such practice is calculated to likely cause confusion to an unwary purchaser by inducing him to purchase one product under the mistaken belief he is purchasing the product of another, and the first user of the name, symbol or design will be protected.[10]
In the case now considered I find the facts to be that by having appropriated and utilized the word "Crown" in the advertising and marketing of its gasoline for retail sale to the consuming public over a period of some forty years in Florida, Standard has acquired a common law title to the use of this word as it relates to the retail sale of gasoline.[11] This, despite the fact that Crown Central was the first to register this trademark in the United States Patent Office, as well as in the Office of the Secretary of State of Florida. The trademarks "Crown Oil and Gas", "Crownzol" and "Crown Winged Power" sought to be registered and used by Crown Central all relate to the various grades of gasoline produced by the latter and offered for retail sale to the consuming public.
It is therefore my view that the chancellor was correct in his finding that the use by Crown Central of the trademarks sought to be registered as identified above would likely cause confusion in the minds of the consuming public, even though the gasoline offered for sale by this party would be merchandised exclusively through a separate class of retail outlets. I am of the further view that the chancellor was likewise correct in finding that the use by Crown Central of the trademark "Crown Oil Burner" in the advertisement and merchandising of its oil heater would not likely cause confusion due to the absence of any relationship between gasoline and equipment used for heating purposes. That part of the decree holding that Standard is the owner of and entitled to the exclusive use of the word "Crown" in the advertisement and retail marketing of its gasoline, and that portion of the decree holding that Crown Central is entitled to register and use the trademark "Crown Oil Burner" in the advertising and retail marketing of its heaters, should be affirmed.
Attention is now directed to that part of the decree which finds and holds that Standard is the owner and entitled to the exclusive use of the word "Crown" in the advertisement and marketing of any and all its petroleum products, in addition to gasoline. This portion of the decree is predicated upon the expressed conclusion of *36 the chancellor that the sale of lubricating oils at retail is so closely associated with the sale of gasoline that the use of the word "Crown" by a competitor of Standard's selling both gasoline and lubricating oils would necessarily cause confusion and likely lead to mistake by the public in the purchase of these products. For the reasons hereinafter stated, I am unable to agree that this finding and conclusion reached by the chancellor is correct as a matter of law.
Cases involving trademark infringement based upon customer confusion generally fall into two classes. In one confusion is proved by the evidence. In the other, the likelihood of confusion is so great it is presumed as a matter of law.[12] The chancellor placed this case in the latter category and reached his conclusion not on evidence, but on a presumption of law.
The facts in this case distinguish it from the bases cited above which were decided on the issue of customer confusion. Here, Standard has never utilized the trademark "Crown" in the advertising and marketing of its lubricating oils. This product has been advertised and sold by Standard under various other trade names mentioned above, none of which include the word "Crown", or any derivation thereof.
Secondly, Standard markets its petroleum products almost exclusively through service stations owned or controlled by it and prominently identified to the consuming public by signs such as "Standard", "Standard Oil Company", and "Standard Oil Products". Seldom, if ever, are the petroleum products marketed by Standard sold through any other retail outlets. If the word "Crown" has acquired a secondary meaning in Florida as denoting a quality gasoline produced by Standard, and has attracted such customer acceptance as to induce a substantial segment of the buying public to patronize Standard service stations, such customers know as a matter of fact from purchases made at Standard stations that the word "Crown" is used only in connection with the sale of gasoline, and that none of Standard's lubricating oils are marketed under such trademark.
On the other hand Crown Central has for almost sixty years advertised and marketed its lubricating oils packaged in containers bearing the trademark "Crown". From the exhibit in the record it appears that such containers also have imprinted thereon in prominent letters the words "Motor Oil  Refined and Sealed by Crown Central Petroleum Corporation". Such oil so marked and identified has been merchandised by Crown Central, both through its own service stations, as well as through independent service stations having no connection with or relationship to major oil companies such as Standard. It is highly unlikely that a motorist patronizing as independent service station and desiring to purchase motor oil for his vehicle could or would be confused or misled in making his purchase by the trademark "Crown" displayed on containers of motor oil sold at such a station. This is particularly true when it is noted that the container bearing such trademark also prominently identifies the producer as Crown Central. If such a motorist desired to purchase only Standard products which had become identified in his mind by the word "Crown", he would have in the first instance sought out and patronized a Standard service station instead of supplying his needs from an independent service station. Furthermore, a motorist patronizing an independent service station could not confuse a motor oil sold and marketed under the trademark "Crown" as a product produced by Standard because he would know if he had ever patronized a Standard service station that their motor oils are marketed and sold under other trade names not containing the word "Crown". Although both gasoline and motor oil are petroleum products and fall within the same general classification *37 under the United States Patent Office regulations, the fact remains that they are different products having different uses and serving different purposes.
In Creamette[13] the plaintiff, was a producer and distributor of macaroni under the trademark "Creamette", sought to enjoin use of the same trademark later utilized by defendant in the advertisement and sale of a frozen dessert. The macaroni was generally sold in food stores throughout the state, while the frozen dessert was sold from retail outlets dispensing only that product. Although both products fall within the general classification of food, it was held that their purpose, use and method of merchandizing was so distinctly different that the use of this trademark by both products would not cause such confusion as would result in the purchase of one product under the mistaken belief that the other product was the subject of the sale. Injunction was accordingly denied.
In Chappell[14] the plaintiff producer of blackberry jams and jellies advertised and marketed under the trademark "Bama" sought an injunction against defendant producer of blackberry wine who later sought to utilize the trademark "Bama" in the advertisement and marketing of its beverage. The court found that the products in question were of a different nature and served different purposes, and therefore there was no likelihood of confusion arising in the minds of the consuming public to the extent that would cause a purchaser to buy one product bearing the disputed trademark under the mistaken belief that he was purchasing the other.
In Webb's City plaintiff advertised and marketed bread produced by it and packaged under the trademark "Dandy". This bread was sold by plaintiff exclusively in its own retail outlet, and was not handled by any other retail merchants in that trade area. Defendant later commenced the advertisement and marketing of its bread under the trade name "Dandee", which product was offered for retail sale in food stores and markets within the same trade area of the first producer. The products involved were identical, and although the trademarks were spelled in a slightly different way, their pronunciation was the same. Plaintiff as the first user of the trademark "Dandy" sought an injunction to restrain the second user of the trademark "Dandee" from use of that trade name in the advertisement and sale of its bakery product. The court pointed out that there was no likelihood that confusion would arise in the minds of the purchasing public by use of the similar trademarks in merchandising bread in the same trade area for the reason that plaintiff's product was sold exclusively in its own retail outlet, which fact was well known to the consuming public. It was evident that any one patronizing any other retail outlet would not be so confused by similarity of the trademarks as to believe that the bread purchased would be the bread produced by plaintiff. Injunction was accordingly denied.
In oral argument before this court counsel for Standard frankly admitted with refreshing candor that the conclusion reached by the chancellor as expressed in his decree could not be reconciled with the principle of law which controlled the several decisions rendered by the United States Circuit Court of Appeals for the Fifth Circuit in the cases of Creamette, Chappell and Webb's City discussed above. Although decisions rendered by courts within the federal jurisdiction are not binding on this court, they are entitled to great weight and careful consideration. It is my understanding of the law that the foregoing decisions clearly set forth the law of Florida and that the principles enunciated therein should control the decision in this case.
It is my view that the use by Crown Central of the trademark "Crown" in the *38 advertising and marketing for retail sale of its motor oil in containers prominently identifying the product as one produced by Crown Central will not, as a matter of law, likely cause confusion in the minds of the consuming public with the gasoline advertised and marketed by Standard under the trademark "Crown". The chancellor in his decree seemed concerned with the possibility that Crown Central might so arrange its display of Crown Motor Oil at service stations as to simulate the gasoline pumps and globes bearing the single word "Crown" located at the service stations operated by Standard as to thereby confuse the traveling motorists and cause them to patronize independent service stations thinking they were entering a service station owned by Standard. If such a practice by Crown Central would in fact result in confusion, this would constitute an unfair trade practice against which Standard would be privileged to seek relief in the courts. Such possibility, however, cannot be presumed nor anticipated and should not be made the basis of a decision on the issues presented in this case. Standard has failed to establish its exclusive right to use of the trademark "Crown" in the sale of petroleum products other than that of gasoline, and no valid reason is shown by this record why Crown Central should be prohibited from registering its trademark "Crown" as it relates to lubricating oil, and in using such trademark in the advertisement and marketing of its motor oil for retail sale in Florida.
It is my opinion that the decree appealed should be affirmed in part, reversed in part and the cause remanded for the entry of an appropriate decree in accordance with the views expressed herein.
NOTES
[1] 495.02 "A trademark by which the goods of any applicant for registrant may be distinguished from the goods of others shall not be registered if it; (6) Consists of or comprises a trademark which so resembles a trademark registered in this state or a trademark or trade name previously used in this state by another and not abandoned, as to be likely, when applied to the goods of the applicant, to cause confusion or mistake or to deceive."
[2] 495.01(1) "The `trademark' as used herein means any word, name, symbol, or device or any combination thereof adopted and used by a person to identify goods made or sold by him and to distinguish them from goods made or sold by others."
[1] Title 15 U.S.C.A. § 1051 et seq.
[2] F.S. Ch. 495, F.S.A.
[3] Barton et al. v. Rex-Oil Co., 2 F.2d 402, 404, 40 A.L.R. 424 (3rd Cir.1924).
[4] Webb's City, Inc. v. Bell Bakeries, Inc., 226 F.2d 700, 702 (5th Cir.1955).
[5] Williamson v. Answer Phone of Jacksonville, Inc. (Fla.App. 1960), 118 So.2d 248, 251.
[6] Harlan-Wallins Coal Corp. v. Transcontinental Oil Co., 64 F.2d 122, 20 CCPA 944 (C.C.P.A. 1933).
[7] Three In One Oil Co. v. St. Louis Rubber Cement Co., 87 F.2d 479 (C.C.P.A., 1937).
[8] Plough, Inc. v. Intercity Oil Co., 26 F. Supp. 978 (E.D.Pa. 1939).
[9] El Modelo Cigar Mfg. Co. v. Gato, 25 Fla. 886, 7 So. 23, 6 L.R.A. 823; Coca Cola Co. v. Stevenson, 276 F. 1010 (S.D. Ill. 1920).
[10] Standard Oil Co. v. Independent Oil Men of America, 58 App.D.C. 372, 30 F.2d 996 (D.C.Cit. 1929); Derby Oil Co. v. White Star Refining Co., 62 F.2d 984, 20 CCPA 816 (C.C.P.A. 1933).
[11] 4 Callman, Unfair Competition and Trademarks, § 97.3(a) (2d Ed. 1950); House of Westmore, Inc. v. Denney, 151 F.2d 261 (3rd Cir.1945).
[12] Webb's City, Inc. v. Bell Bakeries, Inc., supra note 4.
[13] Creamette Co. v. Conlin et al., 191 F.2d 108 (5th Cir.1951).
[14] Chappell et al. v. Goltsman et al., 197 F.2d 837 (5th Cir.1952).