**HUNTINGTON NATIONAL MATTRESS CO.**

v.

**CELANESE CORPORATION OF AMERICA.**

Civ. No. 10291.

United States District Court
D. Maryland.

Feb. 5, 1962.

James L. Dooley, C. Willard Hayes, Cushman, Darby & Cushman, Washington, D. C., and G. C. A. Anderson, Anderson, Barnes & Coe, Baltimore, Md., for plaintiff.

Samuel Gottlieb, Harry Giesow, Gainsburg, Gottlieb, Levitan & Cole, New York City, and Donald N. Rothman, Eugene Feinblatt, Gordon, Feinblatt & Rothman, Baltimore, Md., for defendant.

THOMSEN, Chief Judge.

This is an action for alleged infringement of a registered trademark owned by plaintiff, and to prevent the registration of defendant's mark *Celacloud*. Plaintiff (Huntington) is a West Virginia corporation which is one of a group of five companies operating separate plants in various parts of the country, all of which are affiliated with National Mattress Company (National). In January 1956 International Bedding Company (International), a Maryland corporation, was merged into Huntington, which thereby became the owner of International's registered trademarks *Cloud, Silver Cloud, White Cloud, Fleecy Cloud, Gray Cloud, Baby Cloud, Dream Cloud* and *Cloud-O-Pedic,* under which International had theretofore manufactured and sold mattresses in the Baltimore marketing area, i. e. within about 200 miles of its Baltimore plant. International became a division of Huntington, but continued to operate more or less independently under its former president.

Defendant (Celanese) is a Delaware corporation, which manufactures and sells plastics, chemicals and textile fibers throughout the United States and in foreign markets. It does not manufacture or sell mattresses, but in 1956 it began to promote one of its acetate fibers, under the trademark *Celacloud,* as a filling material for use in upholstery, pillows and mattresses, selling it to furniture and bedding manufacturers.

Huntington seeks: 1. An injunction against the use of the trademark *Celacloud* on, or in association with, or in promotion of the sale of, mattresses within 250 miles of Huntington's Baltimore plant or its plant at Huntington (i. e. the old International plant) or the plants of any of the affiliated companies which now sell mattresses and bed springs under the trademark *Cloud* "or any play thereupon". 2. An injunction against Celanese encouraging or licensing others to do so. 3. Damages. 4. A ruling that Celanese is not entitled to a federal registration of Celacloud which would include its use in pillows and mattresses. 5. An order to the Patent Office setting aside the decision of the Trademark Trial and Appeal Board insofar as it holds that Celanese is entitled to such a registration.

Celanese contends: 1. That its trademark *Celacloud* is not deceptively similar to Huntington's use of *Cloud,* which is a suggestive term and a weak mark; that the use of the mark *Celacloud* by Celanese and its licensees is not likely to cause confusion or mistake or to deceive purchasers as to the source or origin of the goods involved. 2. That the decision of the Trademark Trial and Appeal Board was fair and correct and should be followed.

3. That the merger between Huntington and International was not a bona fide merger and did not vest plaintiff with title to the *Cloud* marks. 4. That the non-regulated use of *Cloud* by the several corporations associated with Huntington constitutes "bare licensing" and an abandonment of that mark by Huntington, because the public is not assured of the quality of the goods marketed thereunder.

### Proceedings in the Patent Office

On July 31, 1956, before the institution of this action, Celanese had filed an application in the United States Patent Office to register *Celacloud* as a trademark for "fibrous filling material for use in upholstery, pillows, mattresses, and the like", alleging use of the mark since July 18, 1956. Huntington filed a notice of opposition [1] in December 1956, averring that *Celacloud* so resembles each and every one of Huntington's "family" of *Cloud* trademarks as to be likely, when applied to Celanese's goods, to cause confusion, or mistake, or deception of purchasers. In addition to denying that allegation, Celanese filed a counterclaim seeking cancellation of each of Huntington's *Cloud* registrations on the grounds of abandonment and of fraudulent representations made to the Patent Office by Huntington and International.

At the request of Celanese, consented to by Huntington, the case in this Court was postponed, so that the Court might have the benefit of the decision of the Patent Office Trademark Trial and Appeal Board. That decision was rendered in November 1960 and is reported at 127 USPQ 428. The Board held:

"The word 'Cloud' which comprises the only feature of similarity between the marks of the parties, possesses an obvious connotation of comfort when applied to mattresses and other items of bedding, and this probably accounts for the common use thereof by other manufacturers as a component of their trademarks for and in connection with their advertising of such goods.

"Considering the nature of the term 'Cloud', the fact that it is in no way emphasized as a feature of applicant's mark, and the differences between the respective marks when considered in their entireties, it is concluded that confusion, or mistake, or deception of purchasers is not reasonably likely to occur." 127 USPQ at 431.

The Board therefore dismissed Huntington's opposition to the registration of *Celacloud* by Celanese. It also dismissed the counterclaim, because it had not been shown that the *Cloud* registrations involved an invasion of any right which Celanese was entitled to assert in that case, and because the conclusion of the Board that there was no likelihood of confusion precluded a finding of probable damage to Celanese from the continued existence of the marks on the register. 127 USPQ at 431.[2]

Following the decision of the Board, Huntington filed a supplemental complaint [3] in which it reiterated its claim

---

1. Opposition and Cancellation Proceeding No. 36,736.

2. The Board also held that it had no jurisdiction to determine whether International's long standing practice of paying push money (P.M.) to retail salesmen as an incentive for them to push sales of its mattresses over those of its competitors violated the antitrust laws; but that regardless thereof, the practice did not involve a misuse by Huntington of its marks in connection with the sale of its goods, and so would not have precluded the granting of the relief requested if the Board had found that Huntington was otherwise entitled thereto. 127 USPQ at 430. It appears from the evidence in the case at bar that the practice is common in the industry, and is even followed by licensees of Celanese. It will not be discussed further herein.

3. Jurisdiction of the original complaint is founded upon 15 U.S.C.A. §§ 1114, 1116 and 1121, and 28 U.S.C.A. § 1338. Jurisdiction of the supplemental complaint is founded upon 15 U.S.C.A. § 1071 and 35 U.S.C.A. § 146. See also 15 U.S.C.A. §§ 1067 and 1070. Jurisdiction over the person of the defendant is founded upon 28 U.S.C.A. § 1391(c).

for an injunction and damages and added a prayer that this Court reverse or set aside the decision of the Patent Office Trademark Trial and Appeal Board.

█ Where a plaintiff seeks to set aside the findings of the Board, his burden is not to be sustained by a mere preponderance of the evidence, but he must show by clear and convincing evidence that the decision is erroneous. See Morgan v. Daniels, 153 U.S. 120, 14 S.Ct. 772, 38 L.Ed. 657; Aluminum Fabricating Co. of Pittsburgh v. Season-All Window Corp., 2 Cir., 259 F.2d 314; Esso Standard Oil Company v. Sun Oil Company, 97 U.S.App.D.C. 154, 229 F.2d 37, cert. den. 351 U.S. 973, 76 S.Ct. 1027, 100 L.Ed. 1491; Century Distilling Co. v. Continental Distilling Co., 3 Cir., 106 F.2d 486, 489, cert. den. 309 U.S. 662, 60 S.Ct. 581, 84 L.Ed. 1010; Bunny Bear, Inc. v. Dennis Mitchell Industries, E.D. Pa., 139 F.Supp. 542, 544 n. 5; Royal Crown Cola Co. v. Crown Beverage Corporation, E.D.N.Y., 195 F.Supp. 130. More evidence has been offered in this Court than was offered before the Board, but its effect is the same. Not only has Huntington failed to meet the burden on it, the evidence clearly supports the decision of the Board.[4]

### Facts

Each of the parties has proposed elaborate findings of fact; they have been ruled on, and the rulings have been filed. This opinion will include only the essential facts necessary to understand the points discussed and the conclusions reached.

### Plaintiff's Marks

International was organized in 1904. From 1928 until its merger with Huntington in 1956, it used the trademarks listed in the first paragraph of this opinion and other similar marks as the names of various items in its mattress line, and registered many of those marks in the Patent Office. All of them except *Cloud, Cloud-O-Pedic,* and *Cloud-O-Rest* consisted of two words, e. g. *White Cloud.* It also produced and sold a number of mattresses bearing labels in which the words "Cloud Bedding" or "by the makers of Cloud" were coupled with other designations.

Because of transportation costs, mattresses are usually sold near their place of manufacture, so International sold only in the Baltimore marketing area, within about 200 miles of its plant. Over the years it spent substantial sums in advertising mattresses bearing its various *Cloud* marks.

Other manufacturers and sellers of bedding, in various parts of the country, have used such trademarks as *Dream Cloud, Summer Cloud, Cloud Rest* and *Silver Cloud.* International made reasonable efforts to prevent use of such marks in areas where it was entitled to object.[5] See Dawn Donut Company v. Hart's Food Stores, Inc., 2 Cir., 267 F.2d 358; Standard Oil Company v. Standard Oil Company, 10 Cir., 252 F.2d 65, at 77, 78, 76 A.L.R.2d 600; Standard Oil Co. of Maine v. Standard Oil Co. of New York, 1 Cir., 45 F.2d 309, at 313; 68 Harv.L. Rev. 814, at 859. However, in the Baltimore area for a great many years Sealy, Inc., one of the largest manufacturers of mattresses, has used the slogan "Sleeping on a Sealy is Like Sleeping on a Cloud". International attempted without success to prevent Sealy's use of this slogan and Sealy still uses it.

From May 1955 until November 1955 International was under a trusteeship in a Chapter XI reorganization proceeding in this Court. In January 1956 International was merged into Huntington, pri-

---

4. Celanese filed a counterclaim based on abandonment of certain marks and fraudulent affidavits in connection with others, alleged upon information and belief, seeking damages. This counterclaim is generally similar to the counterclaim which was denied by the Board; it is without merit, and will not be discussed further herein.

5. Since the merger of International into Huntington, the latter company has made similar efforts with respect to the use of the marks by companies other than the affiliates of National.

marily to permit Huntington to take advantage of International's large tax loss carry forward. Taylor, who was the chief executive and principal stockholder of International, became a minority stockholder of Huntington. International became a division of Huntington, but Edwards, who is the president of Huntington, National and other affiliated companies, agreed with Taylor that Huntington would not interfere with Taylor in the continued operation of International. Taylor testified that "the type of bedding that we produced prior to the merger and still are producing is so entirely different from the general line of the National Mattresses and Huntington National that we wanted to keep our relationship as completely apart as we thought it possible to do so, as our line of bedding is sold in the high or better stores, and the National operation for the most part in the low end, or low price categories". He added: " * * * for all practical purposes other than the corporate set up, we are a separate entity."

In July 1956 formal assignments of International's registered trademarks were made to Huntington. Sometime thereafter Huntington and the other affiliates of National began to use the mark *Cloud* in connection with the sale of some of their mattresses, calling them "Cloud 39", "Cloud 49", "Cloud 59", etc., depending on the price. All of the affiliated companies trade under the name National, use *Namaco* as their principal mark, and have generally produced cheap lines of mattresses.[6] The affiliated companies are subject to the control of National and its officers, but that control is not fully exercised.[7] Although Taylor had given Huntington information about the manufacture of International's mattresses, the *Cloud* line maufactured by Huntington in West Virginia and by the other

affiliates of National was not of the same quality as the *Cloud* line manufactured by International. Indeed, even Huntington makes no effort to see that the *Cloud* mattresses produced in its West Virginia plant are of the same quality as the International line.

### Use of Celacloud by Celanese and its Licensees

In the Spring of 1956, Celanese began to promote one of its acetate fibers, then and now sold as "Type F acetate staple fiber", for use as a filling material in bedding. Maufacturers of mattresses in which the filler is employed are permitted, upon execution of a licensing agreement, to designate by the trademark *Celacloud* the filler used in the mattress. The name *Celacloud* was selected because the prefix "Cela" identifies the product with the corporate name, and the term "cloud" suggests a material which is soft and comfortable. Celanese has a family of trademarks and trade names, commencing with the prefix "cela", e. g. *Celadawn, Celadream, Celafil, Celahair, Celaire, Celaperm, Celascreen, Celaspun, Celastream, Celathin* and *Celawave.* The *Celacloud* filling material is white, soft and fluffy. The licensing agreements provide for control of the structural use of *Celacloud* in the manufacture of mattresses produced and sold under the agreements.

Immediately after the first interstate shipment of *Celacloud,* so labeled, in July 1956, Celanese applied to the United States Patent Office for the registration of *Celacloud* as a trademark on "Fiberous Filling Material For Use in Upholstery, Pillows, Mattresses and the Like". In October 1956, Huntington's counsel wrote Celanese objecting to the use of the mark, but Celanese then and thereafter has taken the position that it is entitled to

---

6. Huntington has a plant in Huntington, W. Va. The affiliated companies have plants in Jasper, Ala., Saginaw, Mich., Tyler, Tex., Orlando, Fla., and Cincinnati and Youngstown, Ohio.

7. The vice-president of National and of its affiliates testified: "Up to a point

the parent company sends out guides which are to be followed by the plant managers, but in all instances the affiliate plant manager really has the responsibility for the manufacture of these products. Q320 That is, in determining the standards, the type and the quality of the production. A Yes."

use and register the mark for the purposes indicated. Huntington opposed the registration of the mark, but lost its case before the Trademark Trial and Appeal Board, as above noted.

*Celacloud* was offered for sale at the National Association of Bedding Manufacturers' Show in Chicago in November 1956, and has been sold to and used by manufacturers to some extent since. The number of licenses reached a peak of eighteen in 1960; there are now seven, in various parts of the country.[8] *Celacloud* is also sold for use in upholstery and certain types of clothing.

Celanese has advertised *Celacloud* as a filler for mattresses in national magazines and has engaged in a program of cooperative advertising with retailers selling mattresses using the filler. In their newspaper and point of sale advertising some of those retailers have featured the name *Celacloud*, followed by such language as "Fabulous new wonder filling by Celanese in this Stearns & Foster innerspring mattress—only at Gimbel's". Others have referred to the mattresses as "Celacloud Mattresses". Celanese is anxious that the former rather than the latter type of advertising be used, in order to promote the good will of Celanese products, especially the Celacloud fiber with its various intended uses. However, it would probably be impossible for Celanese to prevent the occasional reference to Celacloud-filled mattresses as "Celacloud Mattresses". During 1957 and 1958 some mattresses labeled "The Celacloud" were sold by a Washington manufacturer in the Baltimore marketing area.

### Discussion

Sec. 32 of the Lanham Act, 15 U.S.C.A. § 1114, defines trademark infringement as the use, without the consent of the registrant, of any "reproduction, counterfeit, copy, or colorable imitation of any registered mark in connection with the sale, offering for sale, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods or services; * * * ".

Although the filling material sold by Celanese to upholstery and bedding manufacturers is not in direct competition with mattresses, Celanese authorizes its licensees to refer to their mattresses as filled with *Celacloud* and some licensees and retailers have referred to their mattresses as "Celacloud mattresses". These facts require the Court to consider the question whether such use is likely to cause confusion in the minds of purchasers of mattresses as to the "source of origin of such goods". Mishawaka Rubber & Woolen Mfg. Co. v. Panther-Panco Rubber Co., 1 Cir., 153 F.2d 662, 669, cert. den. 329 U.S. 722, 67 S.Ct. 64, 91 L.Ed. 625; Kay Dunhill, Inc. v. Dunhill Fabrics, S.D.N.Y., 44 F.Supp. 922, at 928; Restatement, Torts, sec. 712, comment e, sec. 728, comment d, sec. 734.

There is no evidence of actual confusion of source and no persuasive evidence of likelihood of confusion. Huntington sponsored a contest devised by one of its attorneys and likened by him to a "consumer reaction test". The nature of the contest is discussed at length in 127 USPQ at 430, and in my findings of fact. Although a proper survey or test may be helpful in many cases, this test was so unfair that it should be given little or no weight in deciding the question at issue herein.

No doubt *Silver Cloud, Fleecy Cloud*, etc., have acquired a special significance in the Baltimore marketing area as indicating International's mattresses. International has also used the mark *Cloud* in the Baltimore area both before its merger with Huntington and as a division of Huntington thereafter. But no such mark was ever used by Huntington in its West Virginia operations or by the other affiliates of National until after Celanese had applied for the registration of Celacloud and after mattresses filled with Celacloud had been offered

---

8. Harrisburg, Pa.; Sioux City, Iowa; Memphis, Tenn.; East Newark, N. J.; Phoenix, Ariz.; Los Angeles, Cal.; West Palm Beach, Fla.

944

for sale. Of course, International had the right to expand into other areas and to use the marks of which it was the registered owner. And if the merger of International into Huntington was a bona fide merger, Huntington now has the right to use those marks, and has the right to license their use by others, provided it exercises supervision and control over the operations of its licensees to prevent the mark from being used in such manner as to deceive the public. 15 U.S.C.A. § 1055; Dawn Donut Company v. Hart's Food Stores, Inc., 2 Cir., 267 F.2d 358, 366 et seq.

■■ But Huntington has no right to prevent others from using a trademark which contains the word "cloud", unless such use is likely to cause confusion or mistake or to deceive purchasers as to the source of origin of the goods in connection with which such mark is used. 15 U.S.C.A. § 1114; Restatement, Torts, secs. 716, 717, 728, 729, 730, 731. The word "cloud" carries an obvious suggestion of comfort and softness when applied to mattresses and other items of bedding, as is attested by its frequent use in slogans and trademarks for such products. But it is a weak mark. Arrow Distilleries v. Globe Brewing Co., 4 Cir., 117 F.2d 347; Ambrosia Chocolate Co. v. Ambrosia Cake Bakery, 4 Cir., 165 F.2d 693; Dixi-Cola Laboratories v. Coca-Cola, 4 Cir., 117 F.2d 352, cert. den. 314 U.S. 629, 62 S.Ct. 60, 86 L.Ed. 505. Although the classification into strong and weak marks is not determinative of the basic question of likelihood of confusion, it is a factor to be considered.[9]

Plaintiff argues that it is always an act of infringement to couple either a descriptive phrase or a suggestive phrase or the infringer's name to the entire trademark of another which has been previously used on the same goods, citing Bellbrook Dairies, Inc. v. Hawthorn-Mellody Farms Dairy, 253 F.2d 431, 45 CCPA 842. That contention is too broad, as will appear from a statement of the same Court in a later case: "The cases which prohibit the registration of a mark which incorporates the entire trademark of another involve trademarks which when considered in their entireties would cause confusion." Murray Corp. of America v. Red Spot Paint & Varnish Co., Cust. & Pat.App., 280 F.2d 158, 161, n. 4.

■ The compound word *Celacloud*, including the prefix Cela, so frequently used by Celanese, is different in appearance and sound from the single word *cloud* or the combinations used by International and Huntington. This Court agrees with the Trademark Trial and Appeal Board: "Considering the nature of the term 'Cloud', the fact that it is in no way emphasized as a feature of applicant's mark, and the differences between the respective marks when considered in their entireties, it is concluded that confusion, or mistake, or deception of purchasers is not reasonably likely to occur." 127 USPQ at 431.[10]

**2.**

■ Although the merger of International into Huntington was made for tax reasons and the assignment of the trademarks was an obvious afterthought, this Court cannot hold that the merger was so lacking in bona fides that Huntington does not have title to International's registered marks. However, the nature and purpose of the merger may be considered, along with the use of International's trademarks by affiliates of Na-

9. Sunbeam Lighting Co. v. Sunbeam Corporation, 9 Cir., 183 F.2d 969, cert. den. 340 U.S. 920, 71 S.Ct. 357, 95 L.Ed. 665; Creametto Co. v. Conlin, 5 Cir., 191 F. 2d 108, cert. den. 342 U.S. 945, 72 S.Ct. 560, 96 L.Ed. 703; Perma-Stone Co. v. Perma-Rock Products, Inc., D.Md., 160 F.Supp. 616; Sears, Roebuck & Co. v. Allstates Trailer Rental, Inc., D.Md., 188 F.Supp. 170; Developments in the Law of Trademarks and Unfair Competition, 68 Harv.L.Rev. 814, 848–849.

10. In reaching this conclusion, I have taken into account the various principles stated in the multitude of cases cited by plaintiff. Each case, however, must be decided by applying such principles to the facts of the particular case.

tional other than Huntington, on the question whether there has been an abandonment of the marks. The subject of abandonment was fully discussed by Judge Lumbard in Dawn Donut Company v. Hart's Food Stores, Inc., 267 F. 2d at 367 et seq. It is unnecessary to repeat that excellent discussion here. The Second Circuit concluded that the Lanham Act carries forward the view of such cases as E. I. duPont de Nemours & Co. v. Celanese Corp., 167 F.2d 484, 35 CCPA 1061, 3 A.L.R.2d 1213, that "controlled licensing does not work an abandonment of the licensor's registration, while a system of naked licensing does". Use by "related companies" does not affect the validity of the mark "provided such mark is not used in such manner as to deceive the public". 15 U.S.C.A. § 1055. The term "related companies" is defined in 15 U.S.C.A. § 1127 as "any person who legitimately controls or is controlled by the registrant or applicant for registration in respect to the nature and quality of the goods or services in connection with which the mark is used". Even if the affiliated companies are so controlled by Huntington as to be "related companies" within the meaning of the statute, there is a duty on Huntington, as the owner and licensor of the registered mark *Cloud*, to take reasonable means to detect and prevent misleading uses of its mark by the affiliated companies. The only effective way to protect the public, where a trademark is used by licensees, is to place on the owner the affirmative duty of policing in a reasonable manner the activities of his licensees to assure that the licensee will apply the mark to a product of substantially the same quality that the public has in the past associated with it. Dawn Donut Company v. Hart's Food Stores, Inc., supra, and 68 Harv.L.Rev. 867–68. That duty rests on Huntington in this case with respect to the use of the *Cloud* mark by the affiliated companies, and the evidence leaves it very doubtful whether Huntington has performed that duty.

But it is not necessary to decide this case on the ground of abandonment.

Whatever good will Huntington and the other companies may be able to develop in connection with their use of the word "Cloud", Huntington is not entitled to prevent the use of the mark *Celacloud* by Celanese and its licensees.

### Conclusion

The decision of the Patent Office Trademark Trial and Appeal Board is correct and should not be reversed or set aside, as requested by Huntington. I will enter a decree dismissing the complaint, the supplemental complaint and the counterclaim, costs to be paid by plaintiff Huntington.