**CHASE FEDERAL SAVINGS AND LOAN ASSOCIATION, Plaintiff,**

**v.**

**CHASE MANHATTAN FINANCIAL SERVICES INC., etc., et al., Defendants.**

No. 84–1642–CIV.

United States District Court, S.D. Florida, Miami Division.

July 2, 1987.

Federal Savings & Loan Association against various affiliates of the Chase Manhattan Bank, N.A. Chase Federal, a federally chartered institution, seeks to prevent the Chase Manhattan Bank affiliates from using the name and mark "Chase" within the State of Florida.

Chase Federal brought its claims for trademark infringement, unfair competition, injury to business reputation, and dilution under the Trademark Act of 1946 as amended (The Lanham Act, 15 U.S.C. § 1051 *et seq.*) and under Florida trademark law (Sections 495.011–495.171, Florida Statutes, which incorporate by reference Florida common law).

Chase Federal contends that its many years of providing services to the Florida community and particularly the South Florida community, created common law (and thus an exclusive) right to the name "Chase" in the State of Florida. Plaintiff further alleges that Chase Manhattan's affiliates are violating that common law right. Chase Manhattan has recently entered the Florida financial market and is advertising and otherwise using the name "Chase" in different parts of the state.

Defendants Chase Manhattan Financial Services d/b/a Chase Manhattan of Florida, Chase Bank International, The Chase Manhattan Bank, N.A. and Chase Home Mortgage Corporation then counterclaimed to enjoin Plaintiff's use of the name and mark "Chase" or any confusingly similar name or mark in the State of Florida. Defendants claimed that their incontestable rights to their federally registered names and marks "Chase" and "Chase Manhattan" preclude Plaintiff from using the name "Chase".

A hearing was held on Plaintiff's Motion for Preliminary Injunction in July and August 1984. A full trial on the matter was held during the period of February 18–26, 1985. Considerable evidence was presented and argument heard. Having considered the evidence and argument by counsel, and having had the benefit of proposed findings of fact and conclusions of

Howard A. Setlin and Thomas Gibson, Therrel, Baisden & Meyer, Weiss, Miami Beach, Fla., for plaintiff.

Eugene E. Stearns, Bradford Swing, Mark Solov, Stearns Weaver Miller, Weissler, Alhadeff & Sitterson, P.A., Miami, Fla., for defendants.

## AMENDED FINDINGS OF FACT AND MEMORANDUM OPINION

HOEVELER, District Judge.

THIS CAUSE came before the Court pursuant to an action brought by Chase

law submitted by the parties, the Court now makes and enters the following findings of fact and memorandum opinion.

## FINDINGS OF FACT

1. Both Plaintiff and Defendants have, either directly or indirectly, or through predecessor or affiliate corporations, used the name "Chase". Each has used the name in one way or the other for a considerable period of time. Each party's use of the name "Chase" is derived from a person's surname. Defendants' adopted the name "Chase" in 1877 in honor of Salmon P. Chase, Secretary of the Treasury under President Lincoln and later Chief Justice of the United States Supreme Court, who had been instrumental in the adoption of the National Bank Act of 1864.

2. Chase Manhattan's claim to the "Chase" name began with the formation of the Chase National Bank of 1877. By 1937, Chase National Bank had grown to be the largest bank in the world.

3. The Chase National Bank used the "Chase" name continuously until its merger in 1955 with The Bank of the Manhattan Company. The Chase Manhattan Bank, as the legitimate successor to the "Chase" name has used the name Chase since that date. At the time of the merger in 1955, Chase Manhattan was the nation's third largest bank. It remains the third largest bank in the United States and is the ninth largest bank in the world.

4. Chase Federal was first organized in 1934 under the name First Federal Savings and Loan Association of Miami Beach. In 1937, Chase Federal adopted the name Chase Federal Savings and Loan Association to honor Mr. Frank A. Chase, the past president of the association under whose guidance Chase Federal became successful. Additionally, it wanted to avoid confusion with two then similarly named institutions in the same area of the state of Florida. Plaintiff adopted the name Chase Federal after disclosure to the Federal Home Loan Bank Board. The evidence indicated that Chase Federal adopted the name in good faith, notwithstanding its awareness of Chase National Bank. Shortly after Plaintiff began using the name Chase in connec-

tion with Chase Federal Savings and Loan Association in 1937, The Chase National Bank investigated Plaintiff's adoption and use and satisfied itself that Plaintiff was not trading upon its name.

5. Until some time after 1960, Chase Federal's business was confined to Miami Beach and limited to those activities permitted to federal savings and loan associations at the time, primarily savings deposits and residential home mortgages.

Since Chase Federal began doing business as a savings and loan institution in South Florida, its business has grown in dollar volume. It has expanded geographically in the South Florida area and expects to continue that expansion throughout the state of Florida.

It has advertised its services in connection with the name and mark "Chase" over the years, spending approximately a total of twenty million dollars. Chase Federal has expended the following annually on advertising:

## ADVERTISING AND PUBLIC RELATIONS EXPENSES

| DATE | FHLB REPORT |
|------|-------------|
| 1937 | $ 4,469.06 |
| 1938 | 6,210.71 |
| 1939 | 6,682.09 |
| 1940 | 9,773.36 |
| 1941 | 9,739.94 |
| 1942 | 9,730.21 |
| 1943 | 6,796.50 |
| 1944 | 3,476.67 |
| 1945 | 9,977.87 |
| 1946 | 10,981.39 |
| 1947 | 16,967.66 |
| 1948 | --- |
| 1949 | 40,581.05 |
| 1950 | 43,559.56 |
| 1951 | 48,007.60 |
| 1952 | 53,505.75 |
| 1953 | 66,307.01 |
| 1954 | 87,286.58 |
| 1955 | 111,069.38 |
| 1956 | 122,950.71 |
| 1957 | 95,855.54 |
| 1958 | 128,269.34 |
| 1959 | 101,487.36 |
| 1960 | 115,600.64 |
| 1961 | 131,367.18 |
| 1962 | 114,726.77 |
| 1963 | 110,208.03 |

| DATE | FHLB REPORT |
|------|------------:|
| 1964 | $ 100,439.05 |
| 1965 | 141,762.62 |
| 1966 | 107,766.00 |
| 1967 | 73,833.00 |
| 1968 | 74,681.00 |
| 1969 | 237,506.00 |
| 1970 | 214,272.00 |
| 1971 | 105,510.00 |
| 1972 | 137,057.00 |
| 1973 | 128,686.93 |
| 1974 | 503,719.92 |
| 1975 | 646,174.95 |
| 1976 | 283,723.91 |
| 1977 | 258,976.00 |
| 1978 | 788,294.00 |
| 1979 | 1,492,784.00 |
| 1980 | 1,891,550.00 |
| 1981 | 2,975,983.00 |
| 1982 | 3,439,244.00 |
| 1983 | 2,961,649.00 |
| 1984 | 2,614,105.00 |
| TOTAL | $20,643,268.34 |

In the years 1979 through 1984, it spent over $1 million per year on advertising. Currently, Plaintiff spends approximately 1.5 million dollars annually on advertising. Chase Federal now has more than twenty branch locations serving the South Florida area. These branches are located primarily in Dade County. Chase Federal also has branches in Broward, Palm Beach, and Martin Counties.

Chase Federal has financed billions of dollars in loans throughout its history. The majority of its financing is concentrated in residential first mortgages. Chase Federal presently services approximately 25,000 residential loan customers.

Plaintiff's assets grew from in excess of one million dollars in 1937 to more than 12 million dollars in 1946. In 1954 its assets were in excess of 44 million dollars. Currently it has assets in excess of 1.8 billion dollars.

| Date | Assets in Excess of (dollars) |
|------|------------------------------:|
| 12/31/54 | 44,000,000 |
| 12/31/55 | 55,000,000 |
| 12/31/56 | 66,000,000 |
| 12/31/59 | 100,000,000 |
| 12/31/60 | 109,000,000 |
| 12/31/62 | 140,000,000 |
| 12/31/63 | 155,000,000 |
| 12/31/65 | 199,000,000 |
| 12/31/69 | 290,000,000 |
| 12/31/70 | 300,000,000 |

| Date | Assets in Excess of (dollars) |
|------|------------------------------:|
| 12/31/71 | 389,000,000 |
| 12/31/75 | 740,000,000 |
| 12/31/76 | 800,000,000 |
| 06/30/77 | 848,000,000 |
| 12/31/77 | 900,000,000 |
| 12/31/78 | 1,000,000,000 |
| 12/31/79 | 1,340,000,000 |
| 12/31/80 | 1,480,000,000 |
| 06/30/81 | 1,520,000,000 |
| 12/31/83 | 1,680,000,000 |

Plaintiff introduced testimony of prominent citizens of South Florida who represent business, television and civic organizations in the area. The purpose of such testimony was to establish that beginning in the 1940's through the 1950's and to the time of trial, the name "Chase" when mentioned or seen in the context of financial matters in the South Florida community meant to those witnesses Chase Federal Savings and Loan Association. Those individuals who testified, however, also indicated their familiarity with the name Chase Manhattan Bank. Plaintiff also introduced evidence from its archives indicating the presence and activity of Chase Federal in the community in the years following its inception. Plaintiff has been the only Florida-based financial institution using the name and mark "Chase" in South Florida until affiliates of Chase Manhattan Bank began doing business in Florida in the 1970's and 1980's.

Plaintiff is active in the South Florida community. It annually sponsors over 100 concerts for South Florida civic, community, and other organizations. Plaintiff contributes in excess of $150,000.00 each year to charitable organizations—in particular, colleges, civic and cultural organizations. Moreover, Plaintiff has now and has long had a reputation for honesty, trustworthiness and community commitment. It is generally regarded by the financial community as having sound and prudent management.

6. The genesis of the problems presented here was the developing deregulation of different aspects of the banking and savings and loan businesses. The reasons for such deregulation, most well known, are not independently important to a resolution of the issues presented. It is enough to

say that the changes of deregulation presented each of the parties with business opportunities which, being taken, brought into apparent collision the use of the name each has previously used without conflict. Chase Manhattan was able to expand geographically outside of the New York metropolitan area. Chase Federal was able to open an expanded range of services and financial products.

Following deregulation, Chase Federal offered services in addition to residential home mortgages. Presently Chase Federal offers commercial construction loans, refinancing and home improvement loans, home equity mortgages, consumer loans and corporate loans. Plaintiff also accepts deposits in both demand and time accounts, and offers automobile loans, boat loans, personal loans, checking accounts, time deposits, NOW accounts, IRA's, Keogh accounts, money market accounts, passbook loans, safety deposit boxes and holiday club accounts.

7. In 1960, Chase Manhattan registered its name "Chase Manhattan" on the Federal Register (No. 717,320, applied for in 1960 and issued on June 20, 1961). In addition, Chase Manhattan holds registrations for the following trademarks:

| | |
|---|---|
| 732,174 | THE CHASE MANHATTAN BANK |
| 788,293 | REMEMBER ... YOU HAVE A FRIEND IN CHASE MANHATTAN BANK |
| 788,294 | YOU HAVE A FRIEND AT CHASE MANHATTAN |
| 910,761 | CHASE MANHATTAN BANK'S CORP/PLAN |
| 1,065,929 | CHASEGRAM |

Chase Manhattan also holds other service mark registrations, several of which disclaim any right to the words included therein other than "Chase". On February 16, 1978, Chase Manhattan filed for trademark registration of the mark "Chase" with logo (Reg. No. 1,123,243).

8. Chase Manhattan has continuously used its names and marks "Chase" and "Chase Manhattan" for well over five consecutive years subsequent to the date of their registration, and the names and marks are still in substantial use in commerce. The evidence has established that the names Chase and Chase Manhattan have been, and are now, well known even outside of the institution's home base of New York City, specifically including the state of Florida and Dade County, primarily in the area of corporate bank accounts, the purchase of mortgages in the secondary market and bulk trading of municipal securities. The Chase Manhattan Bank is known in Florida. The evidence suggests, and there is little question, that Chase Manhattan is and has been known in Florida financial circles, even though heretofore as a New York, or northern, bank.

9. The Chase Manhattan Bank, N.A., and The Chase National Bank, had customer contacts in Florida in the areas of bulk trading of municipal securities, secondary market real estate financing and corporate bank accounts since at least the 1930's. It could not do business as a commercial bank and did not do retail banking in Florida but it did take deposits and lend money for use in Florida during that time.

10. In addition to the Chase Bank offices located in Florida, other Chase companies have conducted business in Florida.

Chase Bank International is a federally chartered banking and financial corporation organized and existing under the provisions of Section 25(a) of the Federal Reserve Act, the Edge Act, and is a wholly owned subsidiary of the Chase Manhattan Bank, N.A. Chase Bank International is doing business at 100 Chopin Plaza, Miami, Dade County, Florida, and has been in business in Dade County, Florida, since 1972 (previously visibly located at the ground level of the DuPont Plaza Hotel in downtown Miami). Chase Bank International lends money to, and takes deposits from individual customers who reside outside the United States and companies domiciled in the United States that engage in international business. By virtue of the international nature of CBI's customers, CBI has done minimal public advertising in Florida. It has not engaged in retail banking, that is, banking directed to the public in Florida. In short, it has maintained a low profile.

11. Chase Home Mortgage Corporation is the successor to the functions of a Flor-

ida corporation previously known as Housing Investment Corporation (HIC) even though it was a subsidiary of Chase Manhattan. In July, 1981, HIC changed its name to Chase Home Mortgage Corporation of the Southeast. In 1983, CHMC–SE transferred its active lending functions to its parent, Chase Home Mortgage Corporation, a Delaware corporation which has been qualified to do business in Florida since May 25, 1982. Prior to 1981, the Chase Manhattan subsidiary, Chase Home Mortgage Corporation, did business in Florida, as above stated, under the name Housing Investment Corporation and was active in its work from 1972 to 1981. During 1984, Chase Home Mortgage Corporation closed $92,319,000.00 in single-family residential loans in the state of Florida. As of December 31, 1984, Chase Home Mortgage Corporation was servicing loans with principal amounts of approximately $285,000,-000.00 consisting of 6,070 loans on real property in Florida.

12. Chase Manhattan Financial Services, Inc. is a Delaware corporation, authorized to transact business in Florida since 1981 under the fictitious names of "Chase" and of "Chase Manhattan of Florida Financial Services, Inc.". Chase Manhattan Financial Services has maintained offices in Florida since 1981, engaging in the consumer lending business, emphasizing car, boat and home equity loans. The expenditures of Chase Manhattan Financial Services, Inc., for advertising in the State of Florida have grown considerably since 1981. In that year, the company spent only $13,-864.25. In 1982, the amount for advertising was $567,074.00, which increased to $583,856.06 in 1983. By 1984, the company's expenditures of advertising in Florida were $1,033,946.59.

13. Chase Manhattan also has a subsidiary, Computer Power, doing business in Florida under a name in which the word "Chase" does not appear.

The following are all "related companies" within the meaning of 15 U.S.C. § 1055:

Chase Manhattan Financial Services, Inc. d/b/a

Chase Manhattan of Florida

Chase Bank International

The Chase Manhattan Bank, N.A.

Chase Home Mortgage Corporation

The Chase Manhattan Corporation

The Chase Manhattan Bank, N.A. has not conducted retail banking in Florida.

The Chase Manhattan, N.A. has not engaged in retail banking, the providing of financial services to the public in Florida.

Prior to 1969, Chase Manhattan had domestic branches only in the city of New York. Prior to 1974, Chase Manhattan had domestic branches only in New York City and the suburban New York counties of Westchester and Nassau. In March, 1974, the Chase Manhattan, N.A. domestic banking position consisted of approximately 220 branches located in New York City and New York State only. In mid–1974, Chase Manhattan, N.A. completed plans to open subsidiary banks in each of New York State's nine banking districts, readying Chase Manhattan, N.A. for unlimited statewide branching which was first to become legally permissible in 1976. In the early 1970's, Chase Manhattan, N.A. was a geographically-oriented bank, limited domestically to New York City and suburban New York City.

14. In the past, banking laws have forbidden Chase Manhattan, N.A. and the other defendants from entering Florida and engaging in retail banking; thus, Chase Federal from 1937 to the present legitimately believed that it would not experience the entry of Chase Manhattan, N.A., and the other defendants into the retail banking business in Florida. The retail banking market is the market that is directed to the public as opposed to that which is directed to other financial organizations.

The wholesale banking market is the business conducted between financial organizations, such as bank to bank. The wholesale banking market includes the secondary market in mortgages and bulk securities transactions. Correspondent banking, corporate banking and institutional banking are forms of wholesale banking.

15. In the late 1970's, stock brokerage firms and other unregulated, nonfinancial institutions began offering interest sensitive, one-day demand accounts with checking-type facilities in various forms such as money market accounts. Because of the phenomenon known as disintermediation, which resulted in funds being drawn out of banks and savings and loan associations and also as a result of these new interest sensitive accounts, Congress adopted a deregulation act permitting both banks and savings and loan associations to offer similar accounts with limited check writing capability. *See Sun Banks v. Sun Federal Savings & Loan*, 651 F.2d 311 (5th Cir. 1981).

Again, in the late 1970's and also in the early 1980's, in response to the competition presented by unregulated, nonfinancial institutions, both banks and savings and loan associations took advantage of the deregulation act by offering money market and other similar accounts, thus setting the stage for competition, and the eventual clash between Chase Federal and the affiliates of Chase Manhattan Bank.

Because of the changes in the laws which allowed new services to be offered by savings and loan associations and banks and which allowed banks and savings and loan associations to expand beyond their traditional geographical limits, all parties have recognized an impending collision in the use of the name "Chase". Evidence offered by Plaintiff, and adopted by Defendants, establishes that there was confusion between Chase Federal and Chase Manhattan. The evidence demonstrated that the confusion involved services and products offered and advertised by Chase Manhattan which brought people to Chase Federal seeking those services and products. There is no evidence of such confusion or conflict on or before 1960 when Chase Manhattan registered its mark, and, of course, the banking regulations did not permit confusion as a practical matter.

Obviously, Chase Manhattan acquiesced to Plaintiff's use of the name Chase Federal in the trading area of Chase Federal where until recently, the two institutions could not and did not compete. Chase Manhattan never complained to Chase Federal about the use of the name "Chase" prior to the filing of its counterclaim in this action. In fact, Chase Federal, since at least as early as 1943, enjoyed a direct banking relationship with The Chase National Bank as an account and custodial account customer and as a user of The Chase National Bank's money order service since 1949. Chase Federal became a correspondent of The Chase National Bank in 1943, and in 1955, it became a correspondent of The Chase Manhattan Bank. Finally, in 1965, Plaintiff became a correspondent bank of The Chase Manhattan Bank, N.A. Plaintiff's correspondent status was not interrupted at any time as a result of the merger of The Chase National Bank and The Bank of the Manhattan Company in 1955, nor was its correspondent status altered as a result of the conversion by The Chase Manhattan Bank to The Chase Manhattan Bank, N.A. Both parties benefitted from the correspondent relationship, as evidenced by a letter from Defendants to Plaintiff:

"We [CHASE MANHATTAN, N.A.] appreciate the opportunity to present a Visa Traveler's Cheque proposal to CHASE FEDERAL SAVINGS AND LOAN ASSOCIATION. This proposal details how the Visa Traveler's Cheque program will *further enhance* CHASE FEDERAL SAVINGS AND LOAN ASSOCIATION's image in the market place, ...

With your name on the Visa Traveler's Cheque you promote your institution to your best customers, not a competitor who is also trying to sell financial services to those same customers." (emphasis added).

## MEMORANDUM OPINION

In order for Plaintiff to receive injunctive relief against Defendants under Section 43(a) of the Lanham Act and the common law of trademark, it must first establish that it has trademark rights in the name and mark "Chase". Second, Plaintiff must demonstrate that the Defendants' mark is similar to that of Plaintiff so that there is a

likelihood of confusion for consumers as to the origin of the banking services provided by Defendants. *Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1512 (11th Cir.1984) (citations omitted); *Scott's Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1228 (3d Cir.1978).

Plaintiff's establishment of the first element, Chase Federal's exclusive right to use the mark and name "Chase" in connection with financial services, depends on the extent to which the surname or common name "Chase", which is by its nature a weak mark, *Conagra,* 743 F.2d at 1513; *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 260 (5th Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980), is shown to have acquired secondary meaning. 743 F.2d at 1513; *Bank of Texas v. Commerce Southwest, Inc.,* 741 F.2d 785, 787 (5th Cir.1984). In determining whether Plaintiff has acquired secondary meaning in the name "Chase", Chase Federal must demonstrate that the primary significance of the name Chase in the minds of South Florida consumers of financial products and services is not the product, banking services, but the producer of that product, Chase Federal. 743 F.2d at 1513; 589 F.2d at 1228.

Various factors must be assessed in a determination of whether the Plaintiff can validly claim secondary meaning in the name and mark "Chase". Those factors are:

> (1) the length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by [Chase Federal] to promote a conscious connection in the public's mind between the name and the Plaintiff's product or business; and (4) the extent to which the public actually identified the name with the Plaintiff's product or venture.

*Conagra, Inc.,* 743 F.2d at 1513 (citations omitted). (The crucial time period for determining the secondary meaning factor is 1960, the date of Chase Manhattan's federal registration. 15 U.S.C. § 1065; *see Scott Paper,* 589 F.2d at 1231.)

■ Plaintiff used the name "Chase" in connection with traditional services offered by savings and loan associations from 1937 until the present. The Court observes that the nature and extent of Plaintiff's advertising was not insubstantial; Plaintiff used considerable advertising to purvey its financial services and cultivate its goodwill in the South Florida community, as demonstrated by Plaintiff's archive evidence. The Court emphasizes, however, that "it is not the amount of money spent on advertising that is important, but the results achieved with the money spent." *Bank of Texas,* 741 F.2d at 788 (citing *Aloe Creme Laboratories, Inc. v. Milsan, Inc.,* 423 F.2d 845, 850 (5th Cir.), *cert. denied,* 398 U.S. 928, 90 S.Ct. 1818, 26 L.Ed.2d 90 (1970). Having reviewed the evidence and heard the testimony of the witnesses, the Court cannot find that Plaintiff's advertising was effective in altering the meaning of "Chase" to the consuming public in 1960 or in 1974, the date of the Wagner survey. Even those individuals testifying as to their respect of and familiarity with the name "Chase" in connection with Plaintiff admitted knowledge of one or more of the Defendants in connection with banking services, albeit in connection with a New York, or northern, bank. In any event, the evidence has not demonstrated that the name "Chase" had acquired secondary meaning as the designation of the business of Chase Federal Savings and Loan Association. Moreover, if the surname Chase has acquired any significance with Plaintiff, the evidence indicated that the strength is connected to the combination of the words "Chase Federal" and "Chase Federal Savings and Loan". The quantum of evidence as to secondary meaning presented by Plaintiff was insufficient. Plaintiff's evidence suggests at most a small measure of secondary meaning, arguably entitling Plaintiff to a very narrow range of protection. *E.R. Squibb & Sons, Inc. v. Cooper Laboratories,* 536 F.Supp. 523, 530 (S.D.N.Y.1982).

■ Defendants contend that the 1974 Wagner survey offered by Plaintiff to prove it had acquired secondary meaning in the name "Chase" should not have been admitted into evidence because of technical

inadequacies. Defendants' objections go to the appropriateness of the survey universe, the format of the questions, the manner in which the survey was taken, and the lack of foundation evidence for and authentication of the survey and its results.

It might be observed at the outset that since the case was tried to the Court without a jury, the simpler and surely the safer course would be to receive the evidence and then ignore it or give it such weight as the Court thought appropriate. *Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. 1189, 1202 (E.D.N.Y.1983). It also bears remembering that if a survey's inadequacies are technical, involving problems in the format of the questions or the manner in which the survey was taken, such shortcomings bear on the weight of the evidence, not its admissibility. *C.A. May Marine Supply Co. v. Brunswick Corp.,* 649 F.2d 1049, 1054–55 (5th Cir.1981); *Holiday Inns, Inc. v. Holiday Out in America,* 481 F.2d 445, 447–48 (5th Cir.1973). Therefore, Plaintiff's contention that the 1974 *ante litem motam* Wagner survey was properly admitted is correct.

Defendants object to the admissibility of the survey on the ground that it does not comport with the requirements for trustworthiness set out in the *Handbook of Recommended Procedures for the Trial of Protracted Cases,* 25 F.R.D. 351, 428–31 (1960). *See Amstar,* 615 F.2d at 264; *Toys "R" Us,* 559 F.Supp. at 1205; *Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp.,* 533 F.Supp. 75, 79–80 (S.D.Fla.1981), *aff'd,* 716 F.2d 854 (11th Cir.1983). The Court notes that if the survey had been conducted for the purpose of litigation, it might well be excludable for failure to satisfy the trustworthiness requirements. Among the defects in the Wagner survey are the failure to show that the survey universe was properly defined (universe not shown to be representative of all of Dade County), *see Bank of Texas v. Commerce Southwest, Inc.,* 741 F.2d 785 (5th Cir.1984) at 789, and the failure to lay the necessary foundation through the testimony of the persons responsible for the various parts of the survey, *see Toys "R" Us,* 559 F.Supp. at 1205. However, because the 1974 Wagner survey was conducted *ante litem motam,* "less foundation evidence is required to satisfy the element of trustworthiness; the same standard should not apply when admitting survey evidence developed before litigation as is applied to surveys developed for the purposes of litigation." *Nestle Co., Inc. v. Chester's Market, Inc.,* 571 F.Supp. 763 (D.Conn.1983), *vacated after settlement,* 756 F.2d 280 (2d Cir.1985). Mr. Rapoport, a member of the public relations firm that conducted the survey, testified for Plaintiff as to the method and procedure used in the survey. While not the survey director, Rapoport was sufficiently involved in the survey for his foundation testimony to establish its trustworthiness. *See Piper Aircraft Corp. v. Wag–Aero, Inc.,* 741 F.2d 925, 931 (7th Cir.1984). In sum, the 1974 Wagner survey was not inadmissible on trustworthiness grounds.

■ While admissible, the Court cannot consider the Wagner survey to be probative of whether Plaintiff established secondary meaning in the name "Chase" either in 1960 or in 1974. The survey's failure to obtain answers to questions relevant to this litigation forces the Court to accord the survey results slight weight. In the case at bar, evidence that Chase Federal was identified when people were asked to provide the names of the first, second, or third financial institutions that came to mind is close to irrelevant to the proper question of whether people associate certain financial services as coming from a single source, to wit, Chase Federal. The question appropriate to the case is not "Have you heard of Chase Federal?" or "What are the first and second financial institutions that come into your mind?" but instead is "When you hear the name 'Chase', what does it mean to you." *See C.A. May Marine Supply Co.,* 649 F.2d at 1054–55 (survey evidence of business goodwill properly deemed irrelevant when the measure of damages appropriate to the case was lost profits); *Exxon Corp. v. Texas Motor Exchange of Houston,* 628 F.2d 500, 507–08 (5th Cir.1980) (plaintiff Exxon's survey asked what was brought to mind when viewer saw photograph of one of

defendant's Texon signs as well as asking what feature of defendant's sign elicited the response); *Holiday Inns, Inc.,* 481 F.2d at 448. Even in *Nestle Co., Inc.,* in which the court relaxed the standards for the admissibility of *ante litem motam* survey evidence, the key questions asked of the survey universe were relevant: "When you hear the name 'Toll House,' what does it mean to you? What else do you think of?" 571 F.Supp. at 770. The survey evidence in the instant cause is to be accorded slight weight because the survey results derive from questions that were not asked in a "specific, limited and probative context," *James Burrough, Ltd. v. Sign of Beefeater, Inc.,* 540 F.2d 266, 279 (7th Cir.1976), and did not probe the primary significance of the term "Chase" in the minds of consumers, *Nestle Co., Inc.,* 571 F.Supp. at 776.

█ This Court's inquiry into the respective rights of the parties in this lawsuit to use the name "Chase" does not end with Plaintiff's inability to demonstrate secondary meaning. Plaintiff has acquired common law rights to use the name "Chase" in conjunction with the word "Federal" through Defendants' acquiescence and affirmative encouragement.

From 1943 until 1984 the Chase National Bank and its successor, Chase Manhattan, enjoyed a correspondent banking relationship with Chase Federal Savings and Loan. Plaintiff Chase Federal maintained accounts with Defendant and its predecessors, and used Defendant's money order service since 1949. It is obvious from the long relationship between the parties and from the 1937 Chase National Bank investigation into Plaintiff's use of the "Chase" name that Defendants were aware of, and condoned, Plaintiff's use of the name "Chase Federal". Plaintiff maintains that Defendants are barred by laches from enjoining its use of the "Chase" name.

Plaintiff's laches defense requires proof of three elements: (1) a delay in asserting a right or claim; (2) that the delay was not excusable; and (3) that the delay caused the defendant undue prejudice. *Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1517 (11th Cir.1984); *Freedom Savings & Loan Association v. Way,* 583 F.Supp. 544, 552 (M.D. Fla.1984), *aff'd,* 757 F.2d 1176 (11th Cir. 1985). The test for laches or estoppel is flexible, requiring a careful examination of both the delay and the prejudice caused by that delay. *Id.*

As to the first element, delay, it is obvious that Chase Manhattan delayed asserting its right or claim to exclusive use of the name "Chase" vis-a-vis Chase Federal. Chase Manhattan did not assert a claim or right to the name "Chase" in 1937 when Plaintiff's use began, in 1955 when it obtained its first set of federal registrations of names including the name "Chase", in 1960 when it obtained a set of federal registrations for the name "Chase Manhattan", in 1978 when it obtained a third set of federal registrations, or in the late 1970's and early 1980's when the deregulation that allowed them a physical presence in Florida occurred. Only after the instant suit was filed did Defendants assert a claim or right to the exclusive use of the "Chase" name.

Defendants have not shown that the delay in asserting their right to the name "Chase" was excusable. Defendants rely on *John R. Thompson Co. v. Holloway,* 366 F.2d 108, 114 (5th Cir.1966), in which it is held that "a registrant's *remedies* are ... limited, and it has no *presently enforceable* rights in an area to which there is no presently provable probability of such expansion of the registrant's services or reputation as will create a likelihood of confusion." (emphasis in original). Defendants have argued that their delay is excusable because they were not permitted by law to compete against Plaintiff in Florida during the time Plaintiff built its business, and thus could not have enforced their right any earlier than they have attempted to do with their counterclaim.

This contention may have been true from 1937 to 1980, when the Depository Institutions Deregulation and Monetary Control Act of 1980 was enacted, and savings and loan associations began to act in areas previously reserved to commercial banks. The banking deregulation, in the form of

amendments to the Bank Holding Company Act, permitting Defendants to engage in interstate banking occurred in the late 1970's, and Defendants began to move into the retail banking business in Florida at that time, according to uncontroverted trial testimony of Plaintiff's banking expert. During the four years between 1980 (when Defendants had already begun to engage in interstate banking in Florida and Plaintiff began to act in part as a bank), and the 1984 counterclaim, Defendants took no steps to protect or assert their right to the name "Chase", which had become presently enforceable, against Plaintiff.

 Further, there is ample case law for the proposition that simply because an entity which is a senior user of a name or mark does not compete in the same geographical area or offer identical goods or services as a junior user does not mean that the senior user cannot protect its name or mark. *See Safeway Stores, Inc. v. Safeway Discount Drugs*, 675 F.2d 1160 (11th Cir.1982); *Kyhos v. Perpetual Savings and Loan Association*, 480 F.2d 204 (4th Cir.1973); *Governor v. Hudson Bay Fur Co.*, 33 F.2d 801 (D.Minn.1928); *Buckspan v. Hudson's Bay Co.*, 22 F.2d 721 (5th Cir.1927); *Caesars World, Inc. v. Caesar's Palace*, 490 F.Supp. 818, 209 USPQ (BNA) 492 (D.N.J.1980).

Defendants have had a national reputation since 1937 at least. Defendants have also done business in Florida since that time as well, e.g., servicing large corporate accounts and carrying on correspondent banking relationships. Defendants' national reputation and business presence in the state during the years that Plaintiff was building its business under the "Chase Federal" name could have formed the basis of an action to enforce their rights to the "Chase" name had they chosen to pursue that course. The Court finds that Defendants' delay in asserting their trademark rights to sole use of the "Chase" name for financial services vis-a-vis Plaintiff was not excusable.

As to the third required element of a laches claim, it is apparent that Plaintiff will suffer prejudice if it has to forbear from using the name "Chase". A review of Plaintiff's advertising expenditures since 1937 and table of assets reveals the not inconsiderable size of Plaintiff's business. At the time of trial, Plaintiff was the twelfth-largest financial institution in Florida. At trial, Plaintiff adduced testimony as to the detriment its business would suffer if forced to change the name with which it has grown. There is no serious dispute that Plaintiff can make out a showing of prejudice stemming from Defendants' failure to assert a claim or right to the "Chase" name since 1937, and especially since the late 1970's, when Defendants began to enter the retail banking business in Florida.

Thus, as a result of Defendants' laches and its continued use of the name, Plaintiff has established its common law right to continue using the name "Chase Federal". *See Sheila's Shine Products, Inc., v. Sheila Shine, Inc.*, 486 F.2d 114, 123 (5th Cir. 1973) ("continuous use of a mark over a substantial period of time will create a property right in that mark. The mere fact that a business is small and its trade modest does not necessarily militate against its being an established business capable of acquiring goodwill and rights in a trademark."); *Gant of New Haven, Inc., v. Chez Boye Parfums International, Inc.*, 256 F.Supp. 982, 985 (M.D.Fla.1966).

 Even if Plaintiff were unable to make a successful laches claim, it has acquired common law rights to use the name "Chase Federal" under the doctrines of good faith adoption and affirmative encouragement. Under the good faith adoption doctrine, set forth in *El Chico, Inc., v. El Chico Cafe*, 214 F.2d 721, 726 (5th Cir. 1954), Plaintiff could continue to use the name "Chase" if, even though the Plaintiff knew of the Defendants' use of the name, they knew that the Defendants did not have an exclusive right to such use as against a noncompeting business, where there was no likelihood of confusion as to source, and in the absence of an intent to benefit from the reputation or good will of the Plaintiff. This Court has determined above that Plaintiff has established a com-

mon law right to use the name "Chase" in conjunction with the word "Federal" as a result of Defendants' laches in asserting its claim or right to the name. Such a determination necessarily implies that Defendants, by virtue of their interest in preserving undiluted their national reputation, coupled with their business activities in this State since the 1930's, could have enjoined Plaintiff from using the same dominant name "Chase" in its name; injunction would have issued to prevent the public in Florida from mistakenly thinking that the bank and savings and loan association were the same entity or were somehow connected. If this was not the case, and Defendants' delay *was* excusable on the ground that any enforcement action they took would have been futile because there was no likelihood of confusion between the non-competing businesses, then the Plaintiff's laches claim might fail. However, even if the laches claim failed because there was no likelihood of confusion between noncompeting businesses, then the *El Chico* good faith adoption doctrine would apply, and the result, that Plaintiff would be able to continue using the "Chase Federal" name, would remain the same.

The record reveals that Plaintiff's intent in adopting the name "Chase" was to honor Mr. Frank Chase, past president of the savings and loan association, who played some part in the passage of the legislation creating savings and loan associations. Although Chase Federal knew of Defendants' predecessor's use of the "Chase" name, knowledge of prior use above does not amount to a bad faith attempt to capitalize on the skill, expenditures and labor of the first user. *E.R. Squibb*, 536 F.Supp. at 532.

For the reasons discussed above, the Court holds that even if Plaintiff's laches claim had not been successful, Plaintiff has acquired the common law right to continue using the name "Chase Federal" under the good faith adoption doctrine set forth in *El Chico, Inc., v. El Chico Cafe, supra.* The evidence shows that Plaintiff has bona fide acquired certain rights to the use of the name "Chase Federal" under the common law by contemporaneous usage despite De-

fendants' registration. *See Abner's Beef House Corp. v. Abner's International, Inc.,* 227 So.2d 865, 869 (Fla.1969).

■ In addition, Plaintiff can avail itself of the acquiescence defense enunciated in *Conan Properties, Inc., v. Conan's Pizza, Inc.,* 752 F.2d 145 (5th Cir.1985) at 152 n. 3, 153. To establish this defense, Plaintiff must prove that (1) Defendants knew or should have known of Plaintiff's use of the name "Chase Federal"; (2) that Defendants' conduct implied that Defendants had no objection to Plaintiff's use of the name; and (3) that since that time, Plaintiff has built up its business under the assumption that it could use that name so that it would be unjust to allow Defendants to force Plaintiff to stop using that name now. *Id.*

The record shows that Defendants' predecessors actually knew of Plaintiff's use of the name "Chase Federal". Defendants and their predecessors, through the correspondent banking relationship, including their permissive use of their name on Chase Federal's checks and their credit card offers, more than implied that they had no objection to Chase Federal's continued use of the name "Chase". Plaintiff's evidence as to its advertising expenses satisfies the third element of the *Conan Properties, Inc., v. Conan's Pizza, Inc.* test, which is similar to the third element required to establish a laches claim as set forth in *Conagra, supra.* Acquiescence involves one party's implicit or explicit assurances to the other party which induce reliance by that other party. *Conan Properties, Inc.,* 752 F.2d at 153; *Dwinell–Wright Co. v. White House Milk Co.,* 132 F.2d 822, 825 (2d Cir.1943). The acquiescence of Chase Manhattan, the senior user, for so many years while Chase Federal was building up a noncompetitive business must be given weight. *See France Milling Co. v. Washburn–Crosby Co.,* 7 F.2d 304, 306 (2d Cir.1925). Accordingly, the Court holds that Defendants' (and their predecessors') acquiescence and affirmative encouragement in Chase Federal's use of the name has given Chase Federal the common law right to continue to use the name "Chase" as part of its longer name.

■ Although Plaintiff has established, through Defendants' laches or acquiescence and affirmative encouragement, its right to continue using the name "Chase Federal", Defendants retain their rights to continue using their federally registered trademarks. Plaintiff asserts that this issue should be governed by the result in *Crown Central Petroleum Corp. v. Standard Oil Co.*, 135 So.2d 26 (Fla. 1st DCA 1961), in which the mark's senior user which had not actively had a retail presence in the state could not enjoin the junior user which actually did have a retail presence in the state from using the senior user's registered name. The *Crown Central Petroleum* court further held that the senior user could not use its name at all in the state in derogation of the junior user's superior right.

In the case *sub judice*, however, the result must differ with respect to the senior users' (Defendants) being forbidden to use their name at all in Florida. Chase Manhattan has had a presence in the state continuously since the 1930's, as shown by the record, and has done business in the state on a larger scale than did the senior user of the "Crown" name in the *Crown Central Petroleum* case, *supra*. While Defendants cannot forbid Chase Federal from using its name, Chase Federal likewise cannot forbid Chase Manhattan from using its registered names, especially when steps can be taken to avoid confusion, when the name at issue is a surname entitled to a narrow scope of protection, and where neither Plaintiff nor Defendants have established secondary meaning in the name in the case.

The Court notes that Defendants, including affiliates and subsidiaries of Chase Manhattan Bank, N.A., have the senior right to use the "Chase" name by virtue of their federal registrations and prior use. Registration gives these entities the exclusive rights to use the name, with the exception of those entities which have acquired a common law right to use the mark. *See Park'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). Defendants are also permitted to expand to new geographic areas using their marks, and to apply such marks to new wares which are natural outgrowths of the trademark's products or services. *Freedom Savings & Loan Association*, 583 F.Supp. at 551.

Chase Manhattan and the other defendants have the right, as priority users, to use their registered marks in this state. The defendants are entitled to carry over, or tack on, the distinguishing features of their trade names for the purpose of establishing prior use of and rights to the term in question. *See Huntington National Mattress Co. v. Celanese Corp. of America*, 201 F.Supp. 938, 944 (D.Md.1962); *Viking Boat Co. Inc. v. Viking Camper Supply, Inc.*, 191 USPQ (BNA) 297, 302 (TTAB 1976); *American Hydrotherm Corp. v. Hydrotherm, Inc.*, 164 USPQ (BNA) 143, 147 (TTAB 1969). Thus, the rights derived from prior use in Florida of the "Chase" name by the Chase National Bank "carry over" to the Chase Manhattan Bank and the other defendants for the purpose of establishing the continuing right to use the "Chase" names in Florida. Defendants' national reputation, as well as its business in Florida, carried the "Chase" name into Florida, and it is entitled to use its names here. Defendants' lack of physical outlets in Florida before the 1970's does not affect their right to use their registered names, since its predecessor's business presence here has been at least "fairly continuous" since it began doing business in Florida in the 1930's. *Citibank, N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540, 1543–1545 (11th Cir.1984); *Safeway*, 675 F.2d at 1162, 1166, 1168; *Kyhos*, 480 F.2d at 208; *Governor*, 33 F.2d at 802; *Buckspan*, 22 F.2d at 723.

Plaintiff maintains that if Defendants are permitted to use their names in Florida, especially in Dade County, the resulting confusion will "obliterate" the business of Chase Federal. Plaintiff has cited to the court, in support of this contention, several 1984 episodes of confusion between the parties. These instances of confusion involved groups of persons who made inquiries of Plaintiff in response to Defendants' advertising.

At the outset, the Court reminds the parties that:

> "ownership of a trademark does not guarantee total absence of confusion in the marketplace. Selection of a mark with a common surname naturally entails a risk of some uncertainty and the law will not assure absolute protection."

*Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1231 (3d Cir.1978).

As mentioned above, in order to receive injunctive relief against Defendants, Plaintiff must establish trademark rights in the name and mark "Chase". Although unable to prove secondary meaning in the "Chase" name, Plaintiff has shown that it has common law rights, acquired by long usage and Defendants' acquiescence, to the name and mark "Chase". Plaintiff must then also show that Defendants' and Plaintiff's marks are similar such that there is a likelihood of consumer confusion as to the source of Defendants' financial services. *Conagra, supra,* 743 F.2d at 1512 (citations omitted). In assessing whether there is a likelihood of confusion with respect to service marks, courts weigh several objective factors: type of service marks, similarity of design, similarity of service facilities and customers, similarity of advertising media used, defendants' intent and actual confusion. *Sun Banks,* 657 F.2d at 314. The Court will examine some of these factors *seriatim.*

### A. Type of Service Mark

As observed above, the name or mark "Chase", being a common surname, is an inherently weak mark deserving only a narrow range of protection, *see Conagra,* 743 F.2d at 1513; *Amstar Corp.,* 615 F.2d at 260, in the absence of a showing of secondary meaning. Neither Plaintiff nor Defendant(s) has acquired as against the other the exclusive right to the name "Chase" through common usage sufficient to obtain ownership of a secondary meaning in the name or mark "Chase". *See Abner's Beef House,* 227 So.2d at 868.

The Court is informed by the observation reported in 3A Callmann, *Unfair Competition, Trademarks & Monopolies* § 20.40 (4th ed.) at 251:

Whether an addition is sufficient to prevent confusion in a particular instance depends upon the strength of the main part of the mark and the distinctiveness of the additional feature. Where a trademark is itself weak, minor additions may effectively negate any confusing similarity.

Because the marks at issue in the instant cause are weak marks, it is probable that the differences in the parties' corporate appellations, if emphasized by different logos, can prevent consumer confusion. *Freedom Savings & Loan,* 757 F.2d at 1183. The appearance and sound of the Plaintiff's and Defendants' marks and names are as different as the marks and names of the parties in *Sun Banks, supra.*

### B. Similarity of Design

Part of the problem from Plaintiff's point of view is that its signage and logo has not been uniform through the years; some signage was designed by employees of the savings and loan association and some came into use because the lettering and designs were what was readily available from the sign manufacturer. Defendants, on the other hand, have consistently used block capital lettering, admittedly in an undistinguished style, together with their registered octagonal corporate logo, which the Court finds to be visually distinctive.

Although the dominant feature in each parties' name is "Chase", the "[u]se of a common word in two different marks does not automatically dictate a conclusion that the two entities are connected. Instead of individual features, the Court must look to the total effect of the design." *Freedom Savings & Loan,* 583 F.2d at 549.

The Court takes judicial notice of Plaintiff's full page advertisement in the June 15, 1987 "Miami Herald" at 16A. *See* Fed. R.Evid. 201. This advertisement announces the formation of "Chase Federal Mortgage Company". Although the new company is not a part of this suit, the Court finds the advertisement informative and helpful to its resolution of the confusion issue. Plaintiff's mortgage company employs a distinctive logo—a circle contain-

ing two stylized eagles separated by the letters CF. While the visual similarity between the plain words "Chase Federal" and "Chase" plus the octagonal logo is not remarkable, if Plaintiff were to consistently use its dual eagle logo in conjunction with the words "Chase Federal", the differences between the entities' marks would be even more pronounced, and the marks at least as different, as those found not confusing in *Sun Banks*, 651 F.2d at 317–18.

### C. Similarity of Service

■ This Court follows the finding of the *Sun Banks* court that the services offered by commercial banks and savings and loan associations are inherently similar, but this similarity is but one factor to be evaluated in assessing the likelihood of confusion. 651 F.2d at 318. Like the *Sun Banks* court, I do not find it to be the dispositive factor.

### D. Identity of Service Facilities and Customers

■ Although the services offered by the parties are inherently similar, and the customers capable of being attracted by the services may be similar, *see Sun Banks*, 651 F.2d at 318, the Court notes that the service facilities offered by Plaintiff and Defendants are not identical. Plaintiff's service facilities in Dade County include more than a dozen branch offices in different residential and shopping areas around the county; Plaintiff has fewer facilities in Broward, Palm Beach and Martin Counties. (The Court has here relied upon, in addition to the record, the 1986–87 Southern Bell Telephone Directory for Greater Miami at 229.) *See* Fed.R.Evid. 201.

Defendants, on the other hand, maintain a low profile in Dade County. Defendant Chase Bank International conducts its business in a large commercial office building in downtown Miami. Its business profile in Dade County is not highly visible. Defendant Chase Manhattan of Florida maintains one office in Dade County. At the time of trial there were four offices of Chase Manhattan of Florida throughout the state, with headquarters in Boca Raton, Palm Beach County.

Defendants' operations in Dade County, where Plaintiff is most established and where the possibility of consumer confusion is greatest, are not conducted through strategically placed branch offices, as are Plaintiff's. The possibility of confusion stemming from this factor is not great.

### E. Advertising

The record shows that both Plaintiff and Defendants advertise in the newspapers. Defendants advertise as well through direct mail programs and telephone solicitation. There is not a significant record showing of media overlap in the parties' advertising.

### F. Intent of the Parties

The Court has discussed above the historical or stated reasons of the parties for adopting their names. There is no evidence in the record upon which to conclude that any party adopted its name or sought to use its name to deliberately capitalize on the other party's reputation.

### G. Actual Confusion

■ Plaintiff has cited to the Court instances of confusion in 1984 in which people came to Chase Federal offices or made telephone inquiries of Chase Federal about services or financial products advertised by Defendants. Plaintiff urges the Court to interpret this confusion in its favor, which should result in an injunction against Defendants' use of the word "Chase" in Florida without the modifier "Manhattan."

First, the Court notes that the instances of confusion complained of occurred three years ago, when Defendant Chase Manhattan of Florida, which placed most of the advertisements at issue, had only recently begun to maintain offices in Florida. This confusion may well have occurred before people had time to assimilate the entry of Defendant's name into the Florida financial community. *See Bank of Texas v. Commerce Southwest, Inc.*, 741 F.2d at 788.

The evidence shows that the confusion complained of by Plaintiff occurred primarily in the summer of 1984. There is nothing in the record that shows that signifi-

cant confusion has occurred since then. Short-lived confusion is worthy of little weight. *Safeway Stores, Inc.*, 675 F.2d at 1167. At no point since the trial of this cause in 1985 has either side formally requested the Court to take additional evidence on the question of confusion. Since the trial, proposed findings and post-trial memoranda have been submitted and the Court has held several hearings. The evidence in the record on confusion remains the same as at the conclusion of the trial. Although Plaintiff has shown that there was confusion of people who were prospective customers, which is a factor to be given substantial weight, *id.*, there is no indication that this confusion is ongoing.

The kinds of products and services offered by both Plaintiff and Defendants, e.g., residential mortgages, car and boat loans, are not low-cost items associated with "impulse" purchases. *See E.R. Squibb*, 536 F.Supp. at 534. Because they are high priced products or services that are connected to the purchase of other high priced items, e.g., houses, cars and boats, there is likely a greater degree of contemplation and care associated with their selection by the consumer. *See Joseph Scott Co. v. Scott Swimming Pools, Inc.*, 764 F.2d 62, 68 (2d Cir.1985); *Fidelity Bond & Mortgage Co. v. Fidelity Bond & Mortgage Co. of Texas*, 37 F.2d 99 (5th Cir.1930) ("People buying mortgage bonds are not apt to rely entirely upon the reputation of the broker offering them, as they would in the case of a manufacturer or dealer offering merchandise. Furthermore, it hardly is possible that both concerns will offer the same issues of bonds at the same time.") The value of actual confusion is greater when the products involved are low value items. 3A Callman, *supra*, § 20.06, at 22 (citations omitted).

It is not completely clear that the confusion evidence adduced by Plaintiff is helpful to Plaintiff's case. The evidence is open to the interpretation that customers really were seeking Chase Manhattan of Florida and came to Chase Federal only because they carelessly confused the name, rather than the interpretation that customers automatically turned to Plaintiff whenever they heard or saw the name "Chase" used in connection with financial services. *See Bank of Texas*, 741 F.2d at 788–89. Further, Defendants point out that the confusion evidence, which they adopted for their counterclaim, should be interpreted in their favor; where potential customers or others making commercial inquiries go to Plaintiff, the junior user, when they are actually responding to Defendants', the senior users, advertising, such confusion is to be considered a factor in giving injunctive relief to the senior user. *See Conagra, Inc.*, 743 F.2d at 1515 and n. 10.

The Court has considered the pertinent factors on likelihood of confusion and finds that only two of them, the "similarity of services" factor and the "actual confusion" factor, show that consumer confusion is likely to occur. Even though the actual confusion in this case probably exceeds the actual confusion found in *Sun Banks, supra,* and *First Southern Federal Savings & Loan Association of Mobile, Alabama v. First Southern Savings and Loan Association of Jackson County, Mississippi,* 614 F.2d 71, 72 (5th Cir.1980), the Court holds that considering all of the evidence, including the different appearance of the disputed marks and the lack of substantially identical service facilities, that these countervailing circumstances lessen the impact of the actual confusion of the summer of 1984. Bearing in mind that the primary object of the trademark laws is not to "protect" trademarks, but is to protect the consuming public from deception, *James Burrough, Ltd. v. Sign of Beefeater, Inc.,* 540 F.2d 266, 276 (7th Cir.1976), the Court concludes that in this case there are equitable measures that can easily be taken to prevent consumer confusion and to protect all parties' right to a non-confused public. The Court discusses these measures below. Accordingly, Plaintiff's request for an injunction compelling Defendants to use the modifier "Manhattan" in their names when used in Florida is denied, as is Defendants' counterclaim.

## EXPANSION

The Court notes with respect to the issue of expansion of the parties' marks throughout the state that

[i]t is true that ordinarily the senior user enjoys superior rights rendering him immune from attack by a junior user. As to territory it is also true there are many instances where the courts have not only protected a senior user moving into new territory from a junior user already in the field, but have granted affirmative relief against the junior user. All of these instances, however, are dependent on their own peculiar facts and illustrate the danger and difficulty of formulating general rules in a field where each determination is highly individualistic.

*Alexander's Department Stores v. Rapoport*, 113 N.Y.S.2d 718, 721 (Sup.Ct.1952).

It is clear that the Defendants, as prior users and holders of registrations for the mark or name in question have the right to expand into Florida with their mark or name. *See Freedom Savings & Loan*, 583 F.Supp. at 551; *Huntington Nat'l Mattress Co.*, 201 F.Supp. at 944.

It is also clear that Plaintiff is entitled to the benefit of the expansion doctrine because is has acquired good faith common law rights to the name throughout long usage. *See Sheila's Shine Products, Inc., v. Sheila Shine, Inc.*, 486 F.2d at 125–27. The use of a mark in one part of a state extends its territorial priority to the entire state. *Id.* at 127.

In this case, the Court sees no need to prevent any party from using its name anywhere in the state given each party's strong right to its name or mark. Any possibility of confusion between the parties can be minimized, if not totally eliminated, by each party's using its name coupled with a distinctive logo. Such a result is strongly indicated by the decision in *Sun Banks, supra.*

## EQUITABLE RELIEF

The Court here sets forth, in an effort to protect the public and the parties from confusion, its equitable relief for both parties. As each party has requested relief that the Court finds just and proper, the Court hereby orders that:

1. Plaintiff has always used the word "Federal" along with "Chase". It has not established a right to use the "Chase" name alone. Plaintiff shall, in its signage and in its advertising and promotional literature, feature the words "Chase Federal", with the word "Federal" displayed either alongside or directly underneath the word "Chase". The word "Federal" shall be displayed in exactly the same size and color lettering as the word "Chase". In addition, Plaintiff shall use a distinctive logo, whether the aforementioned encircled dual eagle logo or another logo, to be prominently displayed alongside the words "Chase Federal". Plaintiff's logo shall not, in any event, be similar in appearance to Defendants' registered octagonal logo. The Court notes, but does not order, that Plaintiff would be well advised to adopt a distinctive type of lettering dissimilar in appearance to that used by Defendants.

2. Defendants may use their registered name "Chase" with their registered octagonal logo in conjunction with the names "Chase Manhattan of Florida", "Chase Bank International", and "Chase Home Mortgage Corporation". Defendants may use the single word "Chase" with its logo as long as the name of one of the entities named above, or a similarly named entity, appears in the same advertisement or promotional literature. Thus, for example, it would not be consonant with the intent of this order for Defendants to advertise only the name "Chase" with the logo on, for example, a billboard. However, Defendants could include in an advertisement for, e.g., Chase Bank of Florida, its "Chase" with logo mark.

Defendants shall not advertise under the name "Chase Federal" in any combination of words. Plaintiff retains the exclusive right to the words "Chase Federal" in Florida.

3. Both Plaintiff and Defendants shall include, in Florida, their newspaper advertisements and promotional literature a disclaimer of affiliation with the other party in order to minimize confusion. *See Joseph Scott Co.*, 764 F.2d at 69; *Taylor Wine Co., Inc. v. Bully Hill Vineyards, Inc.*, 590 F.2d 701, 703–04 (2d Cir.1978). This Court

shall retain jurisdiction over this cause to enforce the terms of this Order.

This Court shall retain jurisdiction over this cause to enforce the terms of this Order.